No. 56,203

MARY ANN McCULLOUGH, *Appellant,* v. BETHANY MEDICAL CENTER, JIMMY KELSO, and CHARLES T. STUBBLEFIELD, M.D., *Appellees.*

(683 P.2d 1258)

Opinion filed June 8, 1984.

*Bryson R. Cloon,* of Cloon & Bennett, of Overland Park, argued the cause, and *Kim Daniel Richey,* of the same firm, was with him on the brief for appellant.

*Sally H. Harris,* of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, argued the cause, and *David K. Knowles,* of the same firm, was with her on the brief for appellees Bethany Medical Center and Jimmy Kelso.

*W. Warren McCamish,* of Williamson & Cubbison, of Kansas City, argued the cause and was on the brief for appellee Charles T. Stubblefield, M.D.

The opinion of the court was delivered by

McFARLAND, J.: This is a medical malpractice action in which plaintiff Mary Ann McCullough appeals from summary judgments entered in favor of defendants Bethany Medical Center, Jimmy Kelso and Charles T. Stubblefield, M.D.

We shall first consider the propriety of the summary judgment entered in favor of Dr. Stubblefield. The general rules relative to summary judgment were summarized in *Olson v. State Highway Commission,* 235 Kan. 20, 679 P.2d 167 (1984) as follows:

"Summary judgment is proper if no genuine issue of fact remains, giving the benefit of all inferences which may be drawn from the admitted facts to the party against whom judgment is sought. A trial court, in ruling on motions for summary judgment, should search the record to determine whether issues of material fact do exist. When summary judgment is challenged on appeal, this court will read the record in the light most favorable to the party who defended against the motion for summary judgment." Syl. ¶ 1.

At this point a statement of the relevant facts in the light most

favorable to the plaintiff is appropriate. Unfortunately, what should be a relatively simple task is rendered difficult by virtue of defendant Stubblefield's noncompliance with Supreme Court Rule 141 (232 Kan. cxlviii), which provides:

"*No motion for summary judgment shall be heard* or deemed finally submitted for decision *until:*

"(a) *The moving party has filed with the court* and served on opposing counsel *a memorandum or brief setting forth concisely in separately numbered paragraphs the uncontroverted contentions of fact relied upon by said movant* (with precise references to pages, lines and/or paragraphs of transcripts, depositions, interrogatories, admissions, affidavits, exhibits, or other supporting documents contained in the court file and otherwise included in the record); and

"(b) Any party opposing said motion has filed and served on the moving party within twenty-one (21) days thereafter, unless the time is extended by court order, a memorandum or brief *setting forth in separately numbered paragraphs (corresponding to the numbered paragraphs of movant's memorandum or brief) a statement whether each factual contention of movant is controverted,* and if controverted, a concise summary of conflicting testimony or evidence, and any additional genuine issues of material fact which preclude summary judgment (with precise references as required in paragraph [a], *supra).*

"The motion may be deemed submitted by order of the court upon expiration of twenty-one (21) days, or expiration of the court ordered extended period, after filing and service on opposing counsel of the brief or memorandum of moving party notwithstanding the failure of the opposing party to comply with paragraph (b), *supra.* In such cases the opposing party shall be deemed to have admitted the uncontroverted contentions of fact set forth in the memorandum or brief of moving party. In determining a motion for summary judgment the judge shall state the controlling facts and the legal principles controlling the decision in accordance with Rule No. 165. (Emphasis supplied.)

The failure of Stubblefield to comply with section (a) thereof rendered it impossible for plaintiff to comply with section (b) of the rule. Therefore the "facts" come to us for appellate review in a rather amorphous mass. More will be said later in this opinion relative to the legal effect of failure to comply with Supreme Court Rule 141. However, we will state the general background from which the cause of action arose and how plaintiff's claim against Stubblefield reached its present legal posture.

In 1980 plaintiff and her husband Bruce McCullough were expecting their first child. Plaintiff selected Dr. Stubblefield as her obstetrician as he was involved in the Bradley method of unmedicated childbirth. Plaintiff and her husband participated in Bradley method classes during the pregnancy. On August 23, 1980, plaintiff went into labor and entered the Bethany Medical Center during the early evening hours. The pregnancy had been

normal and uneventful. The following morning plaintiff was examined by Dr. Stubblefield who advised her she had not dilated sufficiently for a natural childbirth and a Caesarian section would be necessary. Plaintiff became emotionally upset upon learning of this. She stated she wanted to be awake during the procedure. Dr. Stubblefield did not discuss the risks·of a Caesarian section or, specifically, the risk of spinal or epidural anesthesia for this type of operation.

As plaintiff was being wheeled to the operating room she met defendant Jimmy Kelso, a nurse anesthetist employed by defendant Bethany Medical Center. Dr. Stubblefield was not present. Mr. Kelso had been advised by someone, possibly a nurse, that he was to use an epidural anesthetic on plaintiff. Mr. Kelso asked plaintiff questions relative to her medical history and explained how the lumbar epidural anesthetic would be administered. He did not explain the risk of this type of anesthetic presents, either in general or in particular, to a full-term pregnant patient. Anesthetization was attempted several times by inserting a needle with a syringe containing Nesacaine-CE 3%. Ultimately the anesthetic was injected by utilizing the single shot method. Plaintiff immediately went into convulsions and stopped breathing. Her breathing was supported. Dr. Stubblefield arrived and the Caesarian section was performed resulting in the delivery of a living child.

Plaintiff suffers from adhesive arachnoiditis and is now confined to a wheelchair. This neurological condition results from scar tissue growing around the spinal cord. The condition can be caused by negligent insertion of the anesthetic into the spinal space rather than the proper epidural space of the spinal column. There is also some indication an excessive amount of the anesthetic may have been used. There is no allegation plaintiff suffered from this condition before the administration of the anesthetic.

Plaintiff brought this action on behalf of herself, her husband and her child for her personal injuries resulting from the negligent administration of anesthetic and the failure of all involved to advise her of the risks of such anesthetization in order that she could make an informed decision. The original defendants were Dr. Stubblefield, Mr. Kelso, Bethany Medical Center and Pennwalt Corporation, of Philadelphia, Pennsylvania, manufacturer

of the anesthetic. Plaintiff subsequently settled with Pennwalt, and this aspect of the case will be discussed in detail in the next issue.

The district court entered summary judgment in favor of Dr. Stubblefield after making the following findings of fact and conclusions of law:

"1. The Court finds that the pretrial conference has been held and trial is scheduled for September 26, 1983.

"2. The Court finds that there are no genuine issues of fact and this matter may be ruled upon as a matter of law.

"3. The Court finds that the Plaintiff has no expert testimony to establish either that Dr. Stubblefield had any duty to do any of the following or alternatively that he failed to meet any such duty with respect to the following:

"(a) Assessment of the Plaintiff's pre-operative condition;

"(b) Informing the Plaintiff or her husband of anesthesia risks;

"(c) Properly and adequately caring for the Plaintiff post-operatively.

"4. The Defendant's motion for summary judgment substantively complies with Supreme Court Rule 141.

"5. Dr. Stubblefield had no duty to supervise the administration of anesthesia by a certified registered nurse anesthetist.

"6. That as the Plaintiff has no expert testimony to establish a duty of care or a deviation from that duty concerning Dr. Stubblefield, then the Plaintiff does not make a submissible case with respect to Defendant Stubblefield and he may be granted judgment as a matter of law.

"7. Dr. Stubblefield will not be listed for comparative purposes on the jury verdict sheet."

Plaintiff challenges the Stubblefield summary judgment on two grounds. The first is that said defendant's failure to comply with Supreme Court Rule 141 precluded the court from entering summary judgment. The second ground is that there were material facts which were in dispute. We shall first consider the issue in relation to Rule 141.

Instead of complying with Rule 141(a) defendant filed a memorandum which discussed each claim of negligence but did not even attempt to set "forth concisely in separately numbered paragraphs the uncontroverted contentions of fact relied upon by said movant (with precise references to pages, lines and/or paragraphs of transcripts, depositions, interrogatories . . . .)." Plaintiff responded to the motion by noting the summary judgment could not be heard until Rule 141 had been complied with, citing the first sentence in the rule which provides:

"*No motion for summary judgment shall be heard* or deemed finally submitted for decision *until* . . . ." (Emphasis supplied.)

By virtue of defendant Stubblefield's failure to comply with Rule 141(a), plaintiff could not comply with Rule 141(b) relative to what facts were controverted and what were not and the evidentiary basis therefor. At the hearing Stubblefield's counsel stated the case was complex and he thought the way he prepared his memorandum was better, under the circumstances, than following the mandates of Rule 141. The district court agreed and found defendant had "substantially complied" with the rule. We do not agree. The bottom line is the summary judgment was granted with no way to determine then or now what facts are or are not controverted or on what evidence the parties rely. Rule 141 is not just fluff—it means what it says and serves a necessary purpose. Contrary to the opinion of Stubblefield's counsel, a moving party's compliance with Rule 141(a) is even more crucial in complex cases than in simple ones. In accordance with the express language of the rule, the district court could not even hear the motion until the moving party was in compliance with the requirements of the rule. On this basis alone, the summary judgment for Stubblefield must be reversed.

We, therefore, do not reach the second claim of error. However, some comments thereon are appropriate. One of the crucial issues in this case as it pertains to defendant Stubblefield, is the legal relationship between the physician and the nurse-anesthetist. Dr. Stubblefield contends he had no control over Mr. Kelso and hence has no legal liability for any alleged negligence of Mr. Kelso. This is not the first time the legal relationship between a physician and an anesthetist has been before this court.

*Voss v. Bridwell,* 188 Kan. 643, 364 P.2d 955 (1961), was an action against a general surgeon with staff privileges at the University of Kansas Medical Center; an anesthetist-resident; and the department head of anesthesiology for negligent administration of general anesthetic during surgery. The anesthetic had been administered by the anesthetist-resident and the plaintiff sought to connect the resident's negligence to the general surgeon and the department head on a *respondeat superior* theory. See generally 8 Am. Jur. Proof of Facts 2d, Surgeon's Failure to Exercise Supervision and Control Over Anesthetist, p. 579; Annot., Hospital's Liability for Injury or Death to Patient Resulting From Or Connected with Administration of Anesthetic, 31 A.L.R.3d 1114; Annot., Liability of One Physician or

Surgeon For Malpractice of Another, 85 A.L.R.2d 889, § 12[b]. The general surgeon, Dr. Bridwell, alleged as his duties did not encompass the administration of anesthetic he could not be held liable for any injury which occurred to Mr. Voss because of the negligence of the anesthetist-resident. 188 Kan. at 653. The trial court granted the anesthesia department head's demurrer to the plaintiff's petition but denied the surgeon's and resident's demurrers. In the ensuing appeal this court noted the duty of a physician to his patient was not affected by the fact the service rendered was gratuitous, or by the fact the physician had employed a third person so no contractual relation existed between the physician and the patient. 188 Kan. at 652. The *Voss* court then discussed the crucial distinction between right to control and right to supervise the actions of another health care provider. For the latter a surgeon would not be liable, for the former, a surgeon could be accountable.

"In rejecting the contentions of Bridwell we simply hold, upon all the confronting facts and circumstances here presented, a cause of action is stated in Count I against Bridwell. In other words, where a person undertakes to administer anesthesia to a patient and fails to use due care in so doing, he is not the only one who *under all circumstances* may be held liable for the resulting injury.

"It is an established rule that a physician or surgeon must exercise due care in selecting his assistants, and on the simplest principles of law, agency, or of master and servant, a physician or surgeon may be liable for the neglect or fault of his apprentice, agent or employee, such as an assistant who is working under his direction, for injury resulting therefrom to a patient. The fact that a physician's assistant is a member of the same or a similar profession does not make the rule of *respondeat superior* inapplicable. (*Natanson v. Kline,* 186 Kan. 393, 350 P.2d 1093; 41 Am. Jur., Physicians and Surgeons, § 112, p. 223; and 70 C.J.S., Physicians and Surgeons, § 54e, p. 978.)

"*In determining whether a person is the servant of another it is necessary that he not only be subject to the latter's control or right of control with regard to the work to be done and the manner of performing it, but that this work is to be performed on the business of the master or for his benefit. Actual control, of course, is not essential. It is the right to control which is determinative. On the other hand, the right to supervise, even as to the work and the manner of performance, is not sufficient; otherwise a supervisory employee would be liable for the negligent act of another employee though he would not be the supervisor or master of that employee in the sense the law means it.* (Restatement, Agency 2d, § 220[1], [1958]; and *Yorston v. Pennell, Appellant* [1959], 397 Pa. 28, 39, 153 A.2d 255.)" 188 Kan. at 655-56. (Emphasis supplied.)

The court in *Voss* also held the district court had erred in granting the department head's demurrer to the petition for it alleged sufficient facts to show the department head could be

responsible for the negligent acts of the anesthetist-resident. 188 Kan. at 657.

The result of *Voss* that a physician could be liable for the negligence of an anesthetist is consistent with the general view the obligation to provide anesthesia is not necessarily limited to one person. Two doctors, writing on obstetric anesthesia have commented succinctly:

"It is impossible to charge the neglect of obstetric anesthesia to any particular persons or groups involved in the care of the patients. *The responsibility to provide adequate obstetric anesthesia belongs to many.* The influence of even a single person, however, could affect considerable change for the better. *The maternity patient can be offered good anesthesia care only through the mutual and concerted efforts of obstetricians, anesthetists, and hospital administrative personnel.*" Phillips & Ott, *Obstetric Anesthesia,* 1966 Ann. Med. Trial Tech. Q. 149, 163 (1966). (Emphasis supplied.)

While *Voss* involved an anesthetist-resident, as compared to the instant action of a nurse-anesthetist, we note though a surgeon is generally not liable for the negligence of an anesthesiologist, a surgeon usually is liable for the negligence of an anesthetist-resident or nurse-anesthetist under the doctrine of "captain of the ship" which still pertains in most states. 8 Am. Jur. Proof of Facts 2d, Anesthetist Supervision And Control § 1, p. 587.

Conceivably, a factual situation could exist where summary judgment would be proper on the issue of responsibility of the operating surgeon for the negligence of a nurse-anesthetist. However, such a situation would be a rare bird. Ordinarily, determination of the right of control is a matter for the trier of facts. See 8 Am. Jur. Proof of Facts 2d, Anesthetist Supervision and Control § 6, pp. 598, 600-01. Also see generally *Voss v. Bridwell,* 188 Kan. 643; 12 Am. Jur. Proof of Facts, Anesthesia § 1, p. 453.

The summary judgment entered in favor of Dr. Stubblefield is reversed and plaintiff's claim against the physician is remanded for further proceedings.

The second issue before us is whether the district court erred in entering summary judgment in favor of defendants Bethany Medical Center and Jimmy Kelso.

The Pennwalt Corporation of Philadelphia, Pennsylvania, was an original named defendant in the action predicated upon product liability and negligence in connection with the Pennwalt anesthetic, Nesacaine-CE 3% used by Mr. Kelso. Counsel

for Pennwalt and the plaintiff entered into settlement negotiations which culminated in a release being executed on June 29, 1983, and modified the following day. Defendants Bethany and Kelso filed a motion for summary judgment contending this release was a general release of all claims arising from the August 24, 1980, anesthetization of plaintiff. The district court sustained the motion.

In ruling on the motion the district court held:

"The document itself contains the agreement of the parties, and the intent of the parties and the effect of their agreement is to be gleaned from the face of the document and no parol evidence is to be heard."

This was error. As this court said in *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212 Kan. 35, 510 P.2d 145 (1973):

"In such case, since the defendant was not a party to the written release, *parol evidence may be introduced to determine the intention of the parties.* (See *Couillard v. Charles T. Miller Hospital, Inc.*, [253 Minn. 418, 92 N.W.2d 96]; *Dickow v. Cookinham*, 123 Cal. App. 2d 81, 266 P.2d 63, 40 A.L.R.2d 1066; *Fitzgerald v. Union Stock Yards Co.*, 89 Neb. 393, 131 N.W. 612.)" 212 Kan. at 42. (Emphasis supplied.)

The *Fieser* rule is consistent with Restatement (Second) of Torts § 885, Comment *d*, p. 335 (1979):

"The agreement as to the effect of the release may be proved by external evidence; and the objection of the parol evidence rule is met by the fact that the second tortfeasor who raises the question is not a party to the instrument."

Further, there is no indication in the record whether or not the district court placed the burden of proof upon defendants Bethany and Kelso to establish they came within the release. As this court stated in *Fieser v. St. Francis Hospital & School of Nursing, Inc.*, 212 Kan. 35:

"When a general release discloses on its face that it has been given to named releasees who denied liability but made payment by way of compromise and settlement, then and in that event other alleged wrongdoers who were not parties to the release and made no payment toward satisfaction can fairly be called upon to show that either the release which they rely on was intended to discharge them or that the releasor has received full compensation. If they are unsuccessful in their proof then they should not be insulated from liability for their tortious acts." 212 Kan. at 41-42.

Succinctly:

"The execution of a release pleaded by a defendant in his answer is an allegation of an affirmative defense concerning which the defendant must sustain

the burden of proof. (*Tabor v. Lederer*, 205 Kan. 746, 472 P.2d 209)." 212 Kan. at 42.

See also *Shinkle v. Union City Body Co.*, 94 F.R.D. 631, 633 (D. Kan. 1982.)

In the absence of any evidence produced by either party on the question of intent, and when the document is silent upon the matter, the Kansas rule is that other parties are "presumed" not released. *Shinkle v. Union City Body Co.*, 94 F.R.D. 631; *Stueve v. American Honda Motors Co., Inc.*, 457 F. Supp. 740 (D. Kan. 1978).

In *Geier v. Wikel*, 4 Kan. App. 2d 188, 603 P.2d 1028 (1979), the Kansas Court of Appeals stated:

"An injured party whose claim for damages is exclusively subject to the Kansas comparative negligence statute may now settle with any person or entity whose fault may have contributed to the injuries without the settlement in any way affecting his or her right to recover from any other party liable under the act. The injured party is entitled to keep the advantage of his or her bargaining, just as he or she must live with an inadequate settlement should the jury determine larger damages or a larger proportion of fault than the injured party anticipated when the settlement was reached. *It follows that the type of release given will have no effect on any party not specifically named in the instrument.*" 4 Kan. App. 2d at 190. (Emphasis supplied.)

In *Kennedy v. City of Sawyer*, 228 Kan. 439, 618 P.2d 788 (1980), we stated:

"*In our present case the city settled the entire liability for Kennedys' damages.* Contrary to the holding of the Court of Appeals the settlement and release given covers all parties who may have contributed in any way to the damages. The plain and unambiguous wording of the release given by the plaintiffs did:

" '[R]elease and forever discharge the said *defendants and all other persons, firms, and corporations, both known and unknown, of and from any and all claims, demands, damages, actions, causes of action, or suits at law or in equity,* of whatsoever kind or nature, for or because of any matter or thing done, omitted or suffered to be done by anyone prior to and including the date hereof on account of all injuries both to person or property resulting, or to result, *from an accident which occurred on or about the 17th day of July, 1975,* near Sawyer, Kansas.' Emphasis supplied.

"When one considers not only the plain wording of this release and the fact the pending action brought by the Kennedys was dismissed with prejudice there can be little doubt that all third-party defendants were relieved of possible future liability to the Kennedys, along with the city and Mr. Aubley. The holding of the Court of Appeals in *Geier v. Wikel*, 4 Kan. App. 2d 188, 603 P.2d 1028 (1979), upon which the Court of Appeals relied, was based upon a very different type of release. Geier was riding in the Wikel car which struck a freight train. Geier received a settlement from the railway company and executed a release which provided:

' "The release . . . further receited that the accident occurred under circumstances which [Randy Geier and Norman Geier] claim render said Company liable in damages, although such liability is denied by said Company, and [Randy Geier and Norman Geier are] desirous to compromise, adjust and settle the entire matter." ' 4 Kan. App. 2d 188.

It was held the release did not inure to the benefit of Wikel since under the plain wording of the release it did not appear there was an intention to release more than the proportionate liability of the railway company. In such case the release did not relate to other possible tortfeasors either by name or by general description, and the intent shown by the wording in the release was to limit the discharge of liability to the railroad." 228 Kan. at 453-54. (Emphasis supplied.)

With the rules and discussions contained in the aforecited cases in mind, we turn to the specific release before us.

The release executed on June 29, 1983, was captioned "General Release of all Claims." The document indicated the agreement was only between the McCulloughs (including their son, B.J.) and "THE PENNWALT CORPORATION, Philadelphia Pennsylvania, including its Pharmaceutical Division, Rochester, New York, and its manufacturing agent, Taylor Pharmacal Co., Decatur, Illinois, hereinafter collectively referred to as 'Pennwalt.' " Nowhere in the document was there any explicit mention of the remaining defendants. However, the document did state the McCulloughs:

"[d]o hereby for and on behalf of themselves, their heirs, administrators, executors, successors and assigns, for and in consideration of the payments agreed to be made by Pennwalt herein, fully and forever release, acquit and *forever discharge Pennwalt,* its successors and assigns, *together with* its respective subsidiaries, agents, insurers, reinsurers, servants, employees, officers and representatives, *and any other person, corporation, or entity involved in any way on Pennwalt's behalf with the* manufacture, *distribution or dispensing of the drug Nesacaine of and from any and all liability, loss, claims,* actions, causes of action, demands, rights, damages, costs, loss of services, expenses and compensation whatsoever, which Mary Ann McCullough, Bruce McCullough or B.J. McCullough now have or which may hereafter accrue, on account of or arising from any known or unknown, foreseen or unforeseen, bodily or mental injury, death, including any claims for punitive damages or increased damages for aggravating circumstances and the consequences thereof, as a result of the alleged administration of Nesacaine to Mary Ann McCullough on or about August 24, 1980." (Emphasis supplied.)

The document contained the following indemnity clause:

"It is further expressly understood and agreed that Mary Ann McCullough and Bruce McCullough will indemnify and hold harmless Pennwalt of, from and against any and all claims, actions, lawsuits, liabilities and/or losses of any kind or

nature whatsoever which do or might arise out of or result from any claim, lawsuit or action brought by or on behalf of Mary Ann McCullough, Bruce McCullough or B.J. McCullough or their estates, arising out of or relating to the administration of Nesacaine to plaintiff on or about August 24, 1980, and will be responsible for and pay in full any and all judgments that might be entered therein against Pennwalt or any other party released herein and will promptly pay and reimburse any and all attorneys' fees, court costs and expenses incurred by Pennwalt and any other party released herein as they become due."

On June 30, 1983, some concern arose on the part of the plaintiff's attorney relative to the language of the release. It was determined certain interlineations should be made to make the point precise that the only party being released was Pennwalt. Consequently, the title of the document was amended to read "General Release of All Claims as to Pennwalt Only" rather than the previous designation, "General Release of All Claims." On the second page of the release a clause which had read: ". . . in consideration for plaintiff's agreement to dismiss, with prejudice, the aforementioned pending lawsuit, and to enter into this General Release . . . ." was amended to state:

". . . in consideration for plaintiff's agreement to dismiss *Pennwalt from* the aforementioned pending lawsuit, *with prejudice,* and to enter into this General Release . . . ."

(Emphasized portions being insertions.)

The number four paragraph on June 29 had read: "Mary Ann McCullough hereby stipulates and agrees that she, as the named plaintiff, will stipulate to the dismissal with prejudice and shall dismiss the pending lawsuit, Case No. 81-C-4009 in the District Court for Wyandotte County, Kansas." On June 30, as amended, paragraph four declared: "Mary Ann McCullough hereby stipulates and agrees that she, as the named plaintiff will stipulate to the dismissal *of Pennwalt only,* with prejudice, *from* the pending lawsuit, Case No. 81-C-4009 in the District Court of Wyandotte County, Kansas." (Emphasized portions being insertions.) Another interlineation to plaintiff's release occurred in paragraph eleven. Previously, as pertinent here, the paragraph had read: ". . . with regard to the advisability of entering into this General Release of All Claims, and that they have been fully advised by said counsel regarding their rights in the execution of this General Release." As amended, paragraph eleven stated: ". . . with regard to the advisability of entering into this

General Release of All Claims *as to Pennwalt only,* and that they have been fully advised by said counsel regarding their rights in the execution of this General Release."

The June 30, 1983, release modifications were made prior to the filing, the same day, of a Stipulation for Dismissal with Prejudice of plaintiff's claim against Pennwalt. The remaining defendants did not sign the dismissal order as required by K.S.A. 60-241(*a*) but they do not contend this rendered the release ineffectual. Rather, they argue they are included in the release. This contention is predicated upon the claim that they were "distributing" or "dispensing" Nesacaine when the same was used on plaintiff and hence, they were included in the following release phrase:

"[F]or and in consideration of the payments agreed to be made by Pennwalt therein, fully and forever release, acquit and forever discharge Pennwalt, its successors and assigns, together with its respective subsidiaries, agents, insurers, reinsurers, servants, employees, officers and representatives, and any other person, corporation, or entity involved in any way on Pennwalt's behalf with the manufacture, *distribution or dispensing of the drug Nesacaine* of and from any and all liability, loss, claims . . . ." (Emphasis supplied.)

The district court held the release, even with the interlineations, constituted a general release and entered summary judgment for defendants Bethany Medical Center and Kelso.

It is undisputed neither Bethany nor Kelso participated in the Pennwalt settlement negotiations. In fact, when invited to do so by Pennwalt, these other defendants declined. On June 23, 1983, Pennwalt's counsel wrote other defense counsel, stating:

"I am writing to advise that defendant Pennwalt and plaintiff McCullough have reached a settlement agreement regarding alleged claims against Pennwalt arising out of the events of August 24, 1980."

No mention was made of any indemnification claim Pennwalt might assert against the other defendants. None has ever been asserted. It was agreed by plaintiff and Pennwalt the amount of settlement was confidential and must never be revealed. The amount has not been disclosed despite the other defendants' efforts to obtain this information. On June 24, 1983, counsel for defendants Bethany and Kelso wrote the district judge herein acknowledging he had been informed "a settlement has been reached between plaintiff and defendant Pennwalt" and seeking to delay Pennwalt's dismissal until after completion of discovery.

The stipulation of dismissal filed on June 30, 1983, provided:

"COMES NOW *plaintiff, Mary Ann McCullough,* by and through her attorneys of record, *and defendant, The Pennwalt Corporation,* by and through its attorneys of record, and *stipulate that defendant, The Pennwalt Corporation, be dismissed with prejudice,* at defendant's costs." (Emphasis supplied.)

Affidavits filed by plaintiff, her attorney, and the Pennwalt counsel are wholly consistent with plaintiff's position that only her claim against Pennwalt was intended to be included in the release.

We conclude, under the totality of the circumstances herein, defendants *Bethany Medical Center and Kelso* have, as a matter of law, failed to carry their burden of proof that they were included in the release filed herein and that the district court erred in entering summary judgment in favor of these defendants.

The judgments herein are reversed and the case is remanded for further proceedings.