NOT DESIGNATED FOR PUBLICATION

No. 119,327

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STEVEN J. BUTTS,
*Appellee*,

v.

FORREST G. BUTTS, DELVA BUTTS, CAROL A. JONES,
KURT A. BUTTS, BRADLEY C. BUTTS, and BRYSON G. BUTTS,
*Appellants*.

MEMORANDUM OPINION

Appeal from Sumner District Court; R. SCOTT MCQUIN, judge. Opinion filed September 20, 2019. Reversed and remanded with directions.

*Clayton J. Kaiser* and *Gary L. Ayers*, of Foulston Siefkin LLP, of Wichita, for appellants.

*Terry L. Malone* and *Marcia A. Wood*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellee.

Before MALONE, P.J., SCHROEDER, J., and MCANANY, S.J.

PER CURIAM: This appeal arises out of a dispute between Steven J. Butts and his siblings—sister Carol Jones and brothers Kurt, Bradley, and Bryson—which led to Steven commencing actions in Sumner, Sedgwick, Comanche, and Cowley Counties for the partition of real estate owned by the family. Steven's brothers sought consolidation of these various cases, and Steven opposed consolidation. Our Supreme Court entered an order consolidating these various actions in the District Court of Sumner County but only for discovery and pretrial proceedings. The Supreme Court's order was never amended or withdrawn.

1

The Supreme Court's order is clear, unambiguous, and cannot be ignored. Nevertheless, the district court charged with conducting pretrial proceedings in the consolidated cases entered a final judgment partitioning among the parties the properties not only in Sumner County but in the other counties as well. We conclude that in view of the Supreme Court's order, the district court in Sumner County lacked the authority to make such a global disposition of the properties. Accordingly, we must reverse the district court's judgment partitioning these properties and remand the case to the district court with directions.

*Factual and Procedural History*

As a preliminary matter, we note that the Butts children and their parents were named parties in the partition actions in two counties and the children alone were named as parties in the other two partition actions. Their mother, Delva Butts, has passed away. The parties agreed on property that should be set aside to Carol and to their father, Forrest Butts. But there remained the division of the remaining tracts among the four brothers. In this appeal, Kurt, Bradley, and Bryson challenge the district court's entry of a final judgment partitioning the various tracts which are located in Sumner, Sedgwick, Comanche, and Cowley Counties.

The tracts at issue were acquired over many years by Forrest Butts, the family patriarch. Over the years, Forrest transferred ownership of his farming operations to his children. Around 2013, business relations between Steven and his brothers and his father began to falter. Steven sought to dissolve the partnerships under which many of the properties were operated and, in 2015, he commenced partition actions in Sumner, Sedgwick, Comanche, and Cowley Counties where the various tracts were located.

Steven's siblings and their father moved the Supreme Court for consolidation of these various actions for all purposes. Steven opposed consolidation and did "not consent

to a joint trial pursuant to K.S.A. 60-242(c)(3)." Accordingly, the Supreme Court granted relief but only in part, consolidating the actions in the district court in Sumner County, but only for the limited purpose of discovery and pretrial proceedings—not for trial.

In February 2016, the district court in Sumner County carved out several tracts—tracts in Cowley and Sedgwick County that Steven had no interest in and a tract in Sumner County that had been set aside as the home of the elderly Forrest Butts—and ordered that the remaining properties be partitioned among the parties. The court also appointed three commissioners under K.S.A. 60-1003(c)(2) to assist the district court in doing so.

In August 2016, the commissioners held the first of several meetings with the family members. During those meetings, the parties agreed that the real value of the land was in the irrigated acres. Commissioner Theurer said: "The value is in irrigated acres, which is what we're trying to equalize. [Everyone] said from the beginning . . . that was the most important thing." The parties agreed that the various irrigated acres were all essentially the same.

The properties subject to partition had been appraised by Paul West in 2015. The parties agreed to the accuracy of those appraisals, though the appraisals did not include the appraisal of subsurface mineral rights. The lack of appraisals of the subsurface rights was of no concern at the time because of an understanding between the brothers as to how they planned to handle profits generated from those rights. There were five tracts which have subsurface sand—the Wilson, Susie-East, Klunckner, Thoman, and McAdams tracts— which are referred to as the "sand properties." The Wilson tract is located in Sumner County. Susie-East apparently is part of various Susie tracts located in Sumner County and in Sedgwick County. The Klunckner, Thoman, and McAdams tracts are located in Sedgwick County.

3

While the value of the sand rights to these five properties was never appraised, the values of these subsurface rights vary from one sand property to another. In fact, one tract in particular—the McAdams tract—has such inadequate water rights that it is predicted that there is not enough water for the sand ever to be mined there. It was estimated that one acre of sand property that can be commercially mined is worth almost four times the value of the second most valuable type of property, an acre of irrigated land.

The commissioners noted that there were no appraisals of the sand mining rights to these properties because "all [parties] agreed that no matter who become[s] owner [of the surface rights], that all four brothers should share in income from mining of sand." Thus, regardless of which brother was awarded the surface rights in the partition process, when mining began "all four brothers would share in any royalty from any mining."

The commissioners held their last meeting in December 2016, at which the brothers presented their proposals on how the land should be partitioned. While the division of the irrigated acres was at the forefront of the discussion, there was also considerable discussion about the disposition of the sand properties. Steven reported that there were currently four different bids to mine the sand, and Andale Ready Mix is the major one. Steven stated that "they have offered us 30 cents a ton, and there's 100,000 tons in an acre, so that's considerable more than what they appraised for." Steven advocated for the formation of a limited liability company through which all the proceeds from sand mining and farming on the sand properties would be distributed equally to the four brothers so that the brothers would "share and share alike" the income generated from these properties. The details of such an agreement had not been worked out, but by the end of the meeting Steven's brothers believed that all four brothers would share equally in the income from the sand properties. The commissioners' report of the meeting stated:  "After several meetings, all agreed that no matter who became owner, that all four brothers should share in income from mining of sand."

In February 2017, the commissioners issued their partition report. They recommended that Steven receive, among other tracts, the Wilson sand property. The Wilson sand property apparently will be the first to be mined for sand, and it likely will take at least 23 years before mining on this tract is exhausted. Steven's brothers contend that mining on the other sand tracts which they own cannot commence until mining on the Wilson tract is concluded. They claim that in the meantime Steven will reap $7.14 million in sand profits before mining begins on the remaining sand properties. On the other hand, Steven contends that if sand is mined on his property, he would be foreclosed from any income from a farming operation on the surface.

In its partition report, the commissioners did not consider the value of the Wilson property's sand rights because "[t]he sand was a big unknown of how much value was there, [and] we didn't feel qualified to really respond to the value of the sand under any of those properties." Steven's brothers did not object to the commissioners' report because of the understanding, expressed in the report, that there would be an agreement between the four brothers "whereby all four owners . . . share equally in the sales of sand regardless from which farm the sand is mined." Steven raised some objections, but he raised no objection to this portion of the commissioners' report on the sand properties. He only noted that negotiations were incomplete.

In June 2017, Steven's brothers moved for judgment on the commissioners' report, stating with respect to the sand properties that they understood that "the parties stipulate that the four brothers will each own [equal shares] of the mining royalty" from the sand properties and that "the four brothers have agreed to form a new LLC and operating agreement . . . and to place into the LLC any sand-mining lease with its attendant income and the landowner's share/cash rent for each of the [sand properties]," and asking that the district court enter an order to that effect.

5

The hearing on the motion for judgment on the commissioners' report was held on Monday, August 7, 2017. Late Friday afternoon before the Monday hearing, Steven filed a response to his brothers' motion in which he argued that the mineral rights should follow the surface rights of all of the properties—a change from his previously held position. At the August 7 hearing, Steven stated that any sand mining on the properties was "blue sky" and that he did not "know if any of it is going to work out." Steven's brothers argue that they were blind-sided by Steven's last-minute change of position and that a partition based on his current position is patently unfair and inequitable.

At the conclusion of the August 7 hearing, as memorialized in the court's November 30, 2017 journal entry of judgment, the district court divided between the parties the various properties located in the several counties where the family had operated its farming operations. With regard to the sand properties, the court stated:

> "[T]he issue with the sand properties was a late arriving issue. The Court finds that the easiest solution is that the mineral rights go with the surface. The court finds that this may be a windfall to Steven Butts, but would have been a windfall anyway if the sand had not been discovered until a year from now. The Court also finds that whether sand will be produced is still somewhat speculative. The Court would rather not leave the minerals with the brothers who do not get along."

On December 28, 2017, Steven's brothers moved to alter or amend the judgment, though, in reality, they were seeking a new trial in order to present additional evidence regarding the sand properties. They asserted that after the judgment was entered on the commissioners' report, they confirmed with a representative of Andale Ready Mix the following:

> "*Following* the August 7, 2017 hearing, a meeting between BNSF railroad and Andale Ready Mix took place wherein the BNSF railroad and Andale discussed the fact that the railroad would put the Wilson railway spur in once Andale Ready Mix had the Butts

6

ground leased for the sand mining and Andale Ready Mix was reading to proceed with mining the sand. *After* the August 7, 2017 hearing, and *after* the BNSF/Andale meeting, this information was relayed to Bryson Butts on two occasions by Ed Roberts, the real estate broker for Andale Ready Mix. Mr. Roberts said, 'It's real. It's not speculation. We're going to do this deal.' Further, Mr. Roberts reported that Steven has told Mr. Roberts that he (Steven) will know whether he can proceed with the sand development as of January 2, 2018."

They argued that the district court's partition of these sand properties was erroneous because the appraisals relied upon in partitioning these properties "did not take into account the mineral interests, which have now been estimated to be in the millions of dollars." They asked for a rehearing to allow them to present evidence regarding the imminence of the mining operations. They also asked that the court order new appraisals of the sand properties that include the value of these mineral rights in arriving at a fair market value.

In response, Steven submitted an affidavit and various documents from Ed Roberts, in which Roberts asserted:

"Andale Ready Mix is still interested and desirous of entering into a letter of intent about mining sand from property owned by the Butts brothers. From that standpoint, Andale Ready Mix's offer to enter into a letter of intent is real. The offer is not mere speculation. On the other hand, as I have told the [Steven's brothers], and anyone else that I have discussed this issue with, at this point, the parities will need to sign a letter of intent, and there are numerous contingencies that will need to be satisfied before mining sand can become a reality. At this point, there are not agreements signed by BNSF or any party regarding a proposed rail spur or the proposed mining of sand. No core samples have been taken from the property Andale Ready Mix wishes to lease. Unless and until the various contingencies have been satisfied, it is not known whether any sand will ever be mined from any of the Butts' properties by Andale Ready Mix. Nevertheless, since July 2014, Andale Ready Mix has been, and is interested in proceeding to determine if the contingencies can be met and to see if agreements can be reached."

Following the January 23, 2018 hearing the district court denied relief, and this appeal followed.

The central issue raised in this appeal is the disposition of the sand properties. The parties presented their oral arguments on this issue to us in May 2019. Thereafter, we directed the parties to file supplemental briefs addressing: (1) whether the Sumner County District Court had the authority to enter the order of partition when our Supreme Court consolidated the pending actions in the various counties in the District Court of Sumner County only for "discovery and pretrial"; and (2) if the district court did not have such authority, should the district court's global judgment be vacated in its entirety or only the parts relating to tracts outside of Sumner County.

The parties have filed their supplemental briefs, and the matter is now ripe for our consideration.

The threshold issue that may be dispositive is whether the district court had the authority to hear and decide the consolidated partition actions. Whether the district court had such authority may be raised at any time, including for the first time on appeal on our own motion. See *In re Care & Treatment of Emerson*, 306 Kan. 30, 33, 392 P.3d 82 (2017). We have unlimited review over this issue. *Wiechman v. Huddleston*, 304 Kan. 80, 84, 370 P.3d 1194 (2016).

Under K.S.A. 60-601(b)(2), a partition action dealing with multiple tracts of land in various counties may be brought in any county in which any tract is situated. K.S.A. 60-601(b) provides:

> "The following actions must be brought in the county in which the real estate is situated, except if it be an entire tract situated in two or more counties, or if it consists of

separate tracts situated in two or more counties, the action may be brought in any county in which any tract or parts thereof is situated:

. . . .

"(2) Actions for the partition of real estate or any estate or interest therein."

The farm properties for which partition was sought are located in Comanche, Cowley, Sedgwick, and Sumner Counties. Rather than seeking partition of all the farm properties in one action in one county, Steven commenced separate partition actions in Comanche, Cowley, Sedgwick, and Sumner Counties. In response to Steven's Sumner County petition, the rest of the family asserted a counterclaim for partition of all the family's farm properties under K.S.A. 60-601(b)(2). In response, Steven denied that "it is appropriate that this real estate be included in the Sumner County partition case." When the other family members then sought an order from the Supreme Court consolidating these cases for all purposes, Steven objected, stating that separate suits in the various counties would be more efficient and cost effective.

While K.S.A. 2018 Supp. 60-242(c)(3) permits the judge assigned to the consolidated cases to conduct a trial of the consolidated actions, that can only be done with the consent of all parties, and Steven advised the Supreme Court that he would not consent to a joint trial of all these actions. Thus, in granting relief in part on the motion to consolidate, the Supreme Court ordered consolidation of the actions but only "for purposes of discovery and pretrial proceedings." No later Supreme Court order was entered permitting the district court in Sumner County to try the consolidated cases.

Steven argues that the district court did not conduct a trial but limited itself to pretrial proceedings consistent with the Supreme Court's order. He argues that the district court's ruling on the commissioners' report was essentially a pretrial summary judgment proceeding. We are not persuaded by this argument.

9

The district court can dispose of cases prior to trial in a number of ways. For example, the court can enter a default judgment against a party. The court can dismiss an action for failure to state a claim or for the plaintiff's failure to prosecute an action. The court can conduct a hearing and enter judgment approving the settlement of a claim made on behalf of a minor or a settlement in class action litigation. The court can enter a default judgment or dismiss an action as the ultimate sanction for failure to make discovery. None of these applies here. But Steven argues that the proceeding to approve the commissioners' report was essentially a summary judgment proceeding.

Summary judgment requires strict adherence to a statutory protocol set forth in K.S.A. 2018 Supp. 60-256 and compliance with Supreme Court Rule 141 (2019 Kan. S. Ct. R. 211). Our Supreme Court has declared that these requirements are not "just fluff." *McCullough v. Bethany Med. Center*, 235 Kan. 732, 736, 683 P.2d 1258 (1984). Summary judgment is predicated on the absence of any genuine issue of material fact. K.S.A. 2018 Supp. 60-256(c)(2). Here, the hearing on the commissioners' report was not a summary judgment proceeding. No such motion was filed. No statement of uncontroverted facts was submitted. The parties admitted that there were disputed material facts, and such disputes cannot be resolved in a summary judgment proceeding. This was not a pretrial proceeding preliminary to the final resolution of disputed material facts at trial. The factual disputes between the parties were resolved by the court at the hearing, after which the court issued a final judgment.

A trial has been defined as "[a] formal judicial examination of evidence and determination of legal claims in an adversary proceeding." Black's Law Dictionary 1812 (11th ed. 2019). "While the word ['trial'] often signifies an examination of matters of law as well, it is commonly used to designate that step in an action by which issues or questions of fact are decided." 75 Am. Jur. 2d, Trial § 1. K.S.A. 60-1003(d) requires that the partition be "just and equitable." Such a determination is a finding of fact. *Safford v. Tibbetts*, 104 Kan. 224, 227, 178 P. 618 (1919).

10

The proceeding in Sumner County at which the district court considered the commissioners' report was a trial. It was an adversary proceeding. It was being held for the purpose of the court hearing evidence and arguments on whether it should enter a final judgment on the commissioners' report. The proceedings concluded with the entry of a journal entry of judgment. This final judgment is now the subject of this appeal.

Steven filed objections to the commissioners' report. Though it was Steven's brothers who initially proposed adoption of the commissioners' report, that changed late on Friday before the Monday hearing when Steven changed his position on disposition of the sand properties. The Monday hearing was the final hearing which resulted in a final judgment. Sworn testimony on matters in dispute was presented at the hearing by Larry Theurer, Bryson Butts, Steven Butts, and Forrest Butts. Numerous exhibits were received into evidence.

Steven objected to a provision in the commissioners' report related to 328 acres owned by the parties. He argued for the court to set a deadline for the parties to attempt to enter into a written agreement regarding this property; and if the parties were unsuccessful, then the court should order the property to be sold at public auction. Steven's brothers argued for the property to be sold at auction. The court found "that there is no extraordinary hardship or oppression that would be caused by partition, and therefore orders this land be sold" and the proceeds divided between the parties according to their percentage of ownership. This finding of "no extraordinary hardship or oppression" was a finding of fact on a disputed matter. It is clear that the district court treated the proceeding as a trial, not a pretrial summary judgment proceeding.

Similarly, Steven objected to the provision in the commissioners' report setting over to him the Pittman and Young tracts unless irrigation issues were adequately addressed. The Pittman and Young tracts were characterized as irrigated acreage. He

11

claimed that the well on the property is in a location not called for in the State's permit and, therefore, is not a legal well. Bryson Butts testified that Pittman and Young have "plenty of water." But due to the question of the legality of the well, Forrest Butts applied for a permit for a new well, which was drilled and is now in use. Steven Butts testified that with regard to the location of this new well, "I think we're not in compliance." According to Steven, it will be necessary to get permission to drill yet another well at the proper location. Commissioner Theurer testified that "the old well was functional, and it was serving the purposes that it was set up to do for 20 years. The new well didn't change any of that." The court ruled that the evidence is that the new well on Pittman Young is just as good at providing water as the old well and has the additional advantage of being legal with the State of Kansas. These were all findings of fact on disputed issues. The parties and the court treated the proceeding as a trial, not a summary judgment proceeding.

When it came to the ultimate disposition of the various properties, the district court was bound by our Supreme Court's order that consolidated these cases for discovery and pretrial proceedings only. Neither the parties nor the district court was free simply to disregard this order. Nor are we. Once discovery and pretrial matters had been resolved, the district court was required to transfer back to the district courts in the originating counties the cases that had been consolidated for these limited purposes. That did not occur. Nor did the parties seek to have the Supreme Court amend its order permitting the district court in Sumner County to make a global partition of all the properties.

The district court's ruling on the commissioners' report was beyond the scope of pretrial and discovery proceedings and contrary to the Sumner County District Court's limited authority expressed in the Supreme Court's order of consolidation. The district court's ruling was a global resolution of all the properties subject to partition wherever located.

But Steven argues that if the district court did not have the authority to enter final orders on the tracts located outside of Sumner County, the district court nevertheless had the authority to partition the Sumner County property, and its actions in that regard should be upheld. We are not persuaded by this argument.

In this context, K.S.A. 60-1003(d) requires that such a separate partition of the Sumner County property must be "just and equitable." There was no commissioners' report that covered only the Sumner County properties. The district court made no determination that, viewed in isolation, each brother received a just and equitable share of the Sumner County properties. Considering only the Sumner County properties, Steven received a disproportionate share—in terms of acreage or total value—over the shares his brothers received. His share was valued at over $1.5 million more than what he would have received in an equal four-way division of the properties. This is not to say that shares that are not mathematically equivalent may not be just and equitable under the circumstances. But the district court has never made a determination that circumstances exist which warrant such a distribution of the Sumner County properties. And finally, the partition of the Sumner County properties included setting aside the Wilson tract to Steven without any determination of the commercial value of the subsurface sand on the property.

Turning briefly to the merits of the case, we conclude that even if the district court had the authority to make such a global partition of the properties, it erred in doing so.

Assuming for discussion that the district court had the authority to partition all the properties wherever situated, we understand that the district court had broad powers in doing so; but only to the extent that its powers were exercised in a manner necessary to accomplish a just and equitable partition of the properties. See K.S.A. 60-1003(d). Thus, we will not intervene unless the district court abused its broad discretion in making a fair and equitable partition of the properties. Such an abuse of discretion occurs if the district

13

court's decision is "based on an error of fact, *i.e.* if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based." *Adamson v. Bicknell*, 295 Kan. 879, Syl. ¶ 2, 287 P.3d 274 (2012).

The properties central to this appeal are the sand properties located in Sumner and Sedgwick Counties. It was estimated that one acre of sand property that can be commercially mined is worth almost four times the value of the second most valuable type of property, an acre of irrigated farm land. Nevertheless, throughout these partition proceedings the values of the sand rights to these properties were never appraised or considered.

The value of these subsurface rights vary from one sand property to another, based on access to water and other factors. Moreover, because the value of property with income-producing potential can be affected by the time that is expected to pass before that income can be realized, the probable sequence of developing the income-producing potential of several tracts can affect the relative market value of each tract. Here, the commissioners did not place any value on the subsurface rights to these properties because "[t]he sand was a big unknown of how much value was there, and we didn't feel qualified to really respond to the value of the sand under any of those properties." None of this was a matter of concern: no test borings were done on the properties to determine the extent of the mineable sand, and no appraisals were made of the mineral rights to these properties because of the understanding that the four brothers would "share equally in the sales of sand regardless from which farm the sand is mined." That all changed on Friday afternoon before the final hearing on the following Monday.

At the Monday hearing, rather than arriving at a just and equitable division of the various properties, the district court declared that its partition decision, which ignored the value of the subsurface sand rights, was the "easiest solution" and that the court's decision "may be a windfall to Steven Butts, but would have been a windfall anyway if the sand

14

had not been discovered until a year from now." Of course, being the easiest solution is not the test for a fair and equitable division. Moreover, the sand *had* been discovered and was a fact the court could not ignore.

We find no evidence in the record to suggest that the sand properties were interchangeable so that it would not matter which brother received which tract. We conclude that even if the court had the authority to make a global partition order, it abused its discretion in partitioning the properties without considering the value of the individual sand properties. See *In re Estate of Einsel*, 304 Kan. 567, 578, 374 P.3d 612 (2016).

To summarize, we conclude that the district court exceeded its authority by including in its final judgment the partitioning of tracts outside of Sumner County. But even if the district court had the authority to make such a global partition of the properties, it abused its discretion in doing so. Accordingly, we must reverse the district court's judgment and remand for further proceedings.

So long as the Supreme Court's order remains in place and prior to a rehearing on Steven's Sumner County partition action, the district court must return the non-Sumner County partition actions to the district courts from whence they came for partitioning of the properties in their respective counties. The court-appointed commissioners in Sumner County need (1) to obtain appraisals of any sand properties located in Sumner County which include the value of the sand located on each tract, and (2) to provide a revised report which sets forth their recommendations for partitioning the Sumner County properties. The district court can then conduct its final hearing to make a just and equitable partition of the Sumner County properties.

Reversed and remanded with directions.