No. 62,303

Shawn A. Leiker, a disabled person, by and through James S. Leiker, her husband and next friend; James S. Leiker, individually, and as parent and natural guardian of Jason Scott Leiker and Jennifer Ann Leiker, minors, and as Special Administrator of the Estate of Shawn A. Leiker, deceased, *Appellees and Cross-Appellants*, v. Wendell P. Gafford; Professional Anesthesia, Inc., a corporation; George W. Marshall, M.D.; Harris, Hodges & Marshall, Chartered, a Professional corporation; and Abbott Laboratories, a corporation, *Appellants and Cross-Appellees*.

(778 P.2d 823)

326

Opinion filed August 4, 1989.

*Charles D. Green*, of Arthur, Green, Arthur, Conderman & Stutzman, of Manhattan, argued the cause and was on the briefs for appellants/cross-appellees George W. Marshall, M.D., and Harris, Hodges & Marshall, Chtd.

*Larry Shoaf*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause and *Vincent A. Burnett*, of the same firm, was with him on the briefs for appellant Wendell P. Gafford.

*Ronald D. Heck*, of Fisher, Heck & Cavanaugh, P.A., of Topeka, appeared for appellant Professional Anesthesia, Inc.

*Richard C. Hite*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause and *Charles E. Hill* and *Dennis V. Lacey*, of the same firm, were with him on the briefs for appellee/cross-appellant Abbott Laboratories.

*Bradley Post*, of Post & Syrios, of Wichita, argued the cause and *Arden J. Bradshaw*, of Wichita, and *Robert E. Keeshan*, of Hamilton, Peterson, Tipton & Keeshan, of Topeka, were with him on the briefs for appellees/cross-appellants Shawn A. Leiker, James S. Leiker, Jason Scott Leiker, and Jennifer Ann Leiker.

*Marla J. Luckert*, of Goodell, Stratton, Edmonds and Palmer, of Topeka, was on the brief for *amici curiae* Kansas Medical Society and Kansas Hospital Association.

*Ronald P. Williams* and *Susan G. Saidian*, of Morrison, Hecker, Curtis, Kuder & Parrish, of Wichita, were on the brief for *amicus curiae* Kansas Association of Defense Counsel.

The opinion of the court was delivered by

HOLMES, J.: This is an appeal in a medical malpractice action by the plaintiffs and by the two principal defendants, Wendell P. Gafford and George W. Marshall, M.D., from various portions of the jury verdict and various rulings and orders of the trial court. The plaintiffs have also filed a conditional or contingent appeal from a trial court order granting a directed verdict in favor of Abbott Laboratories, a corporation, and Abbott Laboratories has filed a cross-appeal from certain evidentiary rulings of the court.

Shawn A. Leiker sustained personal injuries on January 28, 1982, as a result of an excessive dose of spinal anesthetic while she was undergoing a cesarean section delivery of her second

child. She remained semi-comatose until her death on December 14, 1987. This personal injury and wrongful death action was brought by her husband, James S. Leiker, individually, as a representative of her estate, and on behalf of their two children.

The defendants are Wendell P. Gafford, the certified registered nurse anesthetist (CRNA) who administered the spinal anesthesia, and his professional corporation Professional Anesthesia, Inc.; George W. Marshall, M.D., the obstetrician, and his professional corporation Harris, Hodges & Marshall, Chtd.; and Abbott Laboratories (Abbott), a corporation, the manufacturer of the anesthetic drug. At the close of the plaintiffs' evidence, the trial court entered a directed verdict in favor of Abbott. After defendants Gafford and Marshall presented their evidence, the jury determined that Gafford was 90% at fault and Marshall 10% at fault for Shawn Leiker's injuries and resulting death. The jury also found specifically that Marshall was legally responsible for one or more of the acts of Gafford which caused the injury and death.

The jury awarded plaintiffs $1,250,000 for the personal injury claim and $3,003,100 for the wrongful death claim. Of the total award for wrongful death, the trial court reduced the amount of $2,000,000 awarded for nonpecuniary damages to $100,000 pursuant to K.S.A. 1988 Supp. 60-1903(b). Judgment was entered for the plaintiffs for a total of $2,353,100 against Gafford, Marshall, and their respective professional corporations.

The following issues are raised by the parties:

(1) Did the trial court err in instructing the jury on the issue of informed consent?

(2) Did. the trial court err in allowing the jury to award damages for loss of enjoyment of life as a separate category of compensable damages?

(3) Did the trial court err in allowing the jury to award damages for pain and suffering under the circumstances of this case?

(4) Did the trial court err in failing to grant a new trial on the ground that the jury verdict was excessive and was rendered under passion and prejudice?

(5) In the alternative, did the trial court err in failing to grant a substantial remittitur of the award of damages?

(6) Did the trial court err in refusing to instruct the jury that

there is no presumption of negligence by reason of an adverse result and that a medical practitioner is presumed to have carefully and skillfully treated his patient?

(7) Did the trial court err in instructing the jury on the following claims of negligence against Dr. Marshall, on the basis of alleged insufficient expert testimony to support these claims:

  (a) Whether Marshall failed to supervise administration of the anesthetic as directed by K.A.R. 28-34-17(p);

  (b) whether Marshall was liable for failure to confer with Gafford on the anesthetic drug and dosage before the surgery;

  (c) whether Marshall was liable for failing to require adequate fluid preload;

  (d) whether Marshall was liable for not being present in the operating room when Gafford commenced the anesthesia procedure;

  (e) whether Marshall was liable for failing to detect, diagnose, and promptly treat his patient's distress resulting from the anesthetic; and

  (f) whether Marshall was liable for failing to promptly and properly resuscitate his patient?

(8) Are Marshall and his professional corporation vicariously liable for Gafford's negligence and, if so, to what extent?

(9) Did the jury instructions incorrectly set forth the appropriate duty owed by Gafford and allow the jury to set a standard of its own rather than to rely upon expert testimony?

(10) Did the trial court err in applying K.S.A. 1988 Supp. 60-1903 to reduce the award of nonpecuniary damages for wrongful death, on the ground that the statute is unconstitutional?

(11) Did the trial court erroneously grant Abbott's motion for a directed verdict at the close of the plaintiffs' case, for any of the following reasons:

  (a) The trial court's ruling deprived plaintiffs of their right to a jury trial;

  (b) Abbott Laboratories was negligent per se and the negligence caused plaintiffs' injury;

  (c) the court erred in holding as a matter of law that

Abbott Laboratories had no duty to give an adequate warning regarding its anesthetic drug;

(d) the court erred in overlooking evidence in the record opposing the motion and instead searching the record for evidence to support it;

(e) the court erred in deciding as a matter of law what Gafford knew or should have known about the anesthetic drug;

(f) the court erred in holding as a matter of law that plaintiffs were bound by selected testimony of adverse witnesses;

(g) the court erred in holding that the conduct of Marshall and Gafford could insulate Abbott from liability; and

(h) the court erred in holding as a matter of law that Abbott had no duty to warn Marshall as the treating obstetrician?

(12) Was Abbott Laboratories' 1987 package insert inadmissible pursuant to K.S.A. 1988 Supp. 60-3307?

(13) Did the prejudice to Abbott from admitting the 1987 package insert far outweigh any probative value it may have had against Marshall and Gafford?

This appeal was transferred from the Court of Appeals on this court's own motion, pursuant to K.S.A. 20-3018(c). We have carefully considered all of the many issues and contentions raised by the parties, whether or not discussed at length in this opinion, and find no reversible error. We affirm the trial court. Only a brief summary of the facts is necessary at this point in order to understand the issues raised on appeal.

In January 1982, James and Shawn Leiker were expecting their second child. Their first, Jason, was delivered in 1980 by cesarean section while Shawn was under general anesthesia. The couple was advised that their second child should also be delivered by cesarean, but Shawn wanted to be awake during the delivery. She discussed the options for regional anesthesia with her obstetrician, Dr. George Marshall, who had also delivered Jason. He referred her to Dr. Stoskopf, an anesthesiologist then practicing in Salina where the Leikers resided.

In the early morning of January 28, 1982, Shawn went into labor. Dr. Marshall verified that Shawn was in active labor at

about 10:00 a.m. at his office, and proceeded to schedule the cesarean section with the hospital. Marshall was informed that Dr. Stoskopf was involved in another surgical procedure that would take the rest of the day. He was informed that Gafford, a CRNA, had just finished a case and was available. Marshall went to the hospital, found Gafford, and asked him to handle the Leiker case. Marshall had worked with Gafford before and had confidence in his ability.

Gafford then met with the Leikers at the hospital and allegedly discussed the available anesthesia options. He reported back to Marshall that the Leikers had elected spinal anesthesia, and Marshall concurred. Marshall then changed his clothes and waited in the doctors' lounge with Dr. Hodges, his associate and assistant surgeon, while Gafford initiated the anesthesia procedure.

At 11:40 a.m., Gafford injected Shawn with a 15 mg. dose of tetracaine, a spinal anesthetic manufactured and distributed by Abbott. At 11:45 a.m., Drs. Marshall and Hodges entered the operating room, checked to be sure the anesthetic had taken effect, and commenced the surgery at 11:47 a.m. A baby girl was successfully delivered at 11:52 a.m., and Dr. Hodges briefly showed the newborn to her parents. Dr. Marshall proceeded to complete the surgery and close the incision.

In the meantime, Shawn made several complaints that she was nauseated and unable to breathe. Shortly before noon, as her husband and baby were leaving the operating room, she passed out. Gafford was unable to obtain a pulse or blood pressure. He initiated resuscitation efforts, including an intravenous administration of Valium and, later, intubation. Sometime after 12:15, when the surgical drapes came down, Marshall could see that Gafford was having problems and that Shawn had been intubated. Because Shawn's lung sounds were abnormal, Marshall requested immediate reintubation. Since there was no improvement, Marshall had Dr. Hodges summoned back to the operating room and initiated Code Blue procedures. Eventually Shawn's blood pressure and pulse returned. By then, however, she had already suffered severe brain damage due to lack of oxygen.

Shawn Leiker never fully regained consciousness. She was hospitalized until July 23, 1982, when she was admitted to the Salina Nursing Home. She remained there until she died on December 14, 1987.

Evidence presented by expert testimony and accepted medical texts and treatises overwhelmingly indicated that 15 mg. of tetracaine, administered as a spinal anesthetic in a cesarean section operation, was a massive overdose which caused Shawn Leiker's injuries and ultimate death.

James Leiker filed a personal injury lawsuit on Shawn's behalf on August 4, 1983. After she died, an amended petition was filed on December 22, 1987, adding a claim for wrongful death on behalf of James Leiker and the two children. The case went to trial in January 1988. At the close of the plaintiffs' evidence, Abbott successfully moved for a directed verdict. The trial proceeded with evidence presented by Marshall and Gafford. As indicated earlier, the jury rendered a verdict in the total amount of $4,253,100, finding Gafford to be 90% at fault and Marshall 10% at fault. The trial court reduced to $100,000 the $2,000,000 amount awarded for wrongful death nonpecuniary damages. A number of post-trial motions were made, and all were denied.

Marshall and Gafford appeal from the jury verdict finding them liable. In addition to plaintiffs' cross-appeal contending that the trial court should not have reduced the award for nonpecuniary damages for wrongful death, the plaintiffs separately appeal the directed verdict entered in favor of Abbott. Plaintiffs concede that, if the trial court's judgment is affirmed, their separate appeal as to Abbott is moot. Abbott cross-appeals against the plaintiffs, alleging error in the admission of certain evidence against Gafford and Marshall.

Additional facts will be provided as they become relevant to the analysis of the issues. As several of the issues raised by the defendants involve the court's instructions to the jury, we pause to iterate certain basic principles applicable to appeals involving jury instructions.

In reviewing jury instructions, the following guidelines apply:

"Errors regarding jury instructions will not demand reversal unless they result in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal." *Trout v. Koss Constr. Co.*, 240 Kan. 86, 88-89, 727 P.2d 450 (1986).

We now turn to the issues raised by the parties.

## I. APPEAL OF DEFENDANTS MARSHALL AND GAFFORD
### A. Informed Consent Instruction

The defendants Marshall, Gafford, and their respective professional corporations contend that the trial court erred in instructing the jury on the issue of informed consent. The challenged instruction reads:

"INSTRUCTION NO. 12

"In the absence of an emergency a physician or surgeon has a legal obligation to make a disclosure of the risks and dangers incident to a proposed medical or surgical procedure in order that his patient may make an informed consent thereto, but the duty of the physician is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances.

"What is a reasonable disclosure upon which an informed consent may rest depends upon the facts and circumstances of each case.

"The burden of proof is upon the plaintiff to establish that sufficient information was not disclosed to the patient upon which to rest an informed consent. It is further their burden, before legal liability can be based on such nondisclosure, to establish that the patient, more probably than not, would have refused the procedure had adequate information been disclosed and that, therefore the injury would not have occurred."

The instruction as given generally follows PIK Civ. 2d 15.16, and goes further by emphasizing the plaintiffs' burden of proof when it is contended that a health care provider failed to adequately advise a patient as to the risks of a proposed procedure.

The defendants do not argue that there was no duty to disclose to the Leikers the risks of the procedure. They do argue, however, that where the evidence shows that the defendants did inform the plaintiffs of the risks associated with a medical procedure, the adequacy of the disclosure may be determined only on the basis of expert testimony as to what reasonable physicians or health care practitioners would deem adequate. *Charley v. Cameron*, 215 Kan. 750, 756-57, 528 P.2d 1205 (1974); *Collins v. Meeker*, 198 Kan. 390, 398, 424 P.2d 488 (1967). In addition, they argue that there was insufficient expert testimony on the issue. Defendant Gafford also argues that the instruction given was erroneous because it failed to inform the jury that the adequacy of the consent given must be determined on the basis of expert testimony.

The evidence as to whether Shawn was properly advised of the risks of the proposed anesthesia was disputed. Marshall and

Gafford contended Shawn had been properly advised during her prenatal care and at the hospital. On the other hand, James Leiker testified he could not recall either Marshall or Gafford explaining anything about the complications or risks accompanying the proposed procedure, either when James accompanied Shawn to her prenatal care visits or at the hospital. While both James and Shawn signed a consent form shortly before the anesthetic was administered, he testified no one explained anything about the risks involved. The evidence did not conclusively establish that Marshall and Gafford made any disclosures. It was therefore a question for the jury whether ascertainable disclosures had been made by the defendants in the first place. *Natanson v. Kline*, 187 Kan. 186, 190, 354 P.2d 670 (1960).

As to the contentions regarding expert testimony on the adequacy of the disclosure, the defendants overlook Instruction No. 9, which reads:

"INSTRUCTION NO. 9

"In determining whether a physician, or other health care professional, used the learning, skill, and conduct required of him, you are not permitted to arbitrarily set a standard of your own or determine this question from your personal knowledge. On questions of medical or scientific nature concerning the standard of care of a physician, or other health care professional, only those qualified as experts are permitted to testify. The standard of care is established by members of the same profession or specialty under like circumstances. It follows, therefore, that the only way you may properly find that standard is through evidence presented by physicians called as expert witnesses."

We do not agree that there was no expert testimony as to the adequacy of the disclosures. Much of the plaintiffs' evidence on the informed consent issue was directed to Marshall's failure to disclose the alleged incompetence and inexperience of Gafford. There was considerable testimony by experts for both sides that, if Gafford was indeed unqualified to administer the anesthetic in this case, the patient should have been informed.

When all of the instructions are read together in light of the evidence before the jury, we find no error in the informed consent instruction given to the jury.

B. Loss of Enjoyment of Life as a Separate Category

of Recoverable Damages

Defendants Gafford and Marshall both argue that the trial court erred in instructing the jury that loss of enjoyment of life is compensable under Kansas law as a separate category of nonpe-

cuniary or noneconomic damages for personal injury. *Amici* Kansas Association of Defense Counsel, Kansas Medical Society, and Kansas Hospital Association also contend that loss of enjoyment of life is not separately compensable under Kansas law. The plaintiffs urge this court to adopt what they call the majority rule by recognizing loss of enjoyment of life as a separate category of compensable harm for which damages may be recovered.

The trial court provided the following instruction to the jury on the determination of damages for the personal injury claim:

"INSTRUCTION No. 25

"If it is necessary under the instructions and the directions on the verdict form to fix the loss on the personal injury claims of Shawn A. Leiker, you will then determine the amount of recovery. You should allow such amount of money as will reasonably compensate the Estate of Shawn A. Leiker for her injuries and losses resulting from the occurrence in question, including any of the following shown by the evidence:

"a) Pain, suffering, disabilities, or disfigurement, and any accompanying mental anguish suffered by Shawn A. Leiker up to the time of her death.

"b) *Loss of enjoyment of life and the capacity to enjoy life,* suffered by Shawn A. Leiker up to the time of her death.

"c) Loss of time and income, and earning capacity, by reason of her disabilities up to the time of her death.

"d) The reasonable expenses of necessary medical care, hospitalization, custodial care, and treatment received before her death.

"e) Fair and reasonable compensation for the loss and impairment of Shawn A. Leiker's ability to perform services as a wife to her husband, resulting from her injuries, including loss and impairment of plaintiff's services to her husband in the discharge of her domestic and household duties, and the loss and impairment of Shawn A. Leiker's companionship, aid, assistance, comfort, and society to her husband James S. Leiker." (Emphasis added.)

Defendants Gafford, Marshall, and their respective professional corporations objected to that part of the instruction which allowed the jury to award damages for loss of enjoyment of life as a distinct category of damages.

The personal injury damages portion of the verdict form submitted to the jury was virtually identical to that proposed by the plaintiffs. The jury awarded the following amounts to the estate for Shawn Leiker's personal injuries:

"A. Personal Injury Action

For damages for personal injuries to Shawn A. Leiker occurring on January 28, 1982, and during the period between January 28, 1982, and December 14, 1987, for:

a. Pain and suffering — 150,000
b. Disability — 150,000
c. Disfigurement and any accompanying mental anguish — 150,000
d. *Loss of the enjoyment of life* — *150,000*
e. Loss of time and income, and earning capacity — 100,000
f. Reasonable expenses of necessary medical care, hospitalization, custodial care and treatment — 400,000
g. Loss and impairment of services to husband James S. Leiker — 150,000."

(Emphasis added.)

Defendants rely heavily on *Hogan v. Santa Fe Trail Transportation Co.*, 148 Kan. 720, 85 P.2d 28 (1938). In *Hogan*, as a result of a motor vehicle collision, plaintiff broke a bone in her left hand, which caused permanent stiffening of her little finger. The plaintiff was an accomplished violinist, although her earnings from her avocation were marginal. As a result of the injury, she was no longer able to play the violin. The trial court submitted to the jury a verdict form, which included fifteen special questions. Question 11(6) specifically requested the jury to itemize the amount allowed for loss of enjoyment from being unable to play the violin. The jury awarded $4,000. On appeal, defendants argued that the damages awarded for loss of enjoyment because of inability to play the violin were too speculative and conjectural. In the alternative, they argued that, even if loss of enjoyment was a proper category of damages, the $4,000 jury verdict was excessive. The Kansas Supreme Court noted that the precise question of whether a plaintiff may recover for "loss of enjoyment" was one of first impression in this court.

After noting the various cases pro and con cited by the parties, the court concluded:

"This court, after careful consideration of the entire subject, has concluded to hold that loss of enjoyment resulting from being unable to play the violin is too speculative and conjectural to form a sound basis for the assessment of damages. It is well to bear in mind the jury allowed [$1,000] separately for pain and suffering resulting from the injury. That item is not in dispute. It will also be well to observe the jury allowed nothing for loss of earnings. . . .

"Plaintiff urges that in question 11(6) she might just as well have asked how much the jury allowed for permanent injury, and the element of loss of enjoyment from being unable to play the violin would have been included therein. . . . Furthermore, question 11(6) leaves this court no room to say the

$4,000 or any part thereof was awarded for permanent injury. That question is clear, and an award for permanent injury cannot be read into it. Then, too, even though the court should be inclined to consider the $4,000 item as having been intended to include permanent damages, the court would have no possible way of determining how much thereof was allowed for permanent injuries. It follows the judgment must be modified by a reduction in the sum of $4,000. Otherwise the judgment will be affirmed." 148 Kan. at 729-30.

Two justices, including the author of the majority opinion, joined in a lengthy dissent. 148 Kan. at 730-37.

The defendants in the instant case argue that the trial court's instructions allowing the jury to make a separate award for loss of enjoyment of life were contrary to the rule in *Hogan.* In response, the plaintiffs contend that *Hogan* did not reject loss of enjoyment as a remedy in all cases, and that its holding should be limited to its specific facts. Plaintiffs also point out that in *Hogan* the court may have been concerned about the certainty of the loss itself, while in the instant case it cannot be questioned that Shawn Leiker suffered a complete loss of enjoyment of life between January 28, 1982, and December 14, 1987, the date she died.

We agree with plaintiffs that *Hogan* is clearly distinguishable from the present case. *Hogan* was limited to the facts then before the court, and nothing in the opinion establishes that loss of enjoyment of life may not be a proper element of damages in an appropriate case. We also note that the argument that such damages are too speculative and conjectural could also be asserted as to any area of nonpecuniary damages, such as pain and suffering.

In other cases, this court has implied in dicta that loss of enjoyment may at least be considered one factor in awarding damages. See *Tos v. Handle,* 209 Kan. 139, 141, 495 P.2d 896 (1972), and *Railroad Co. v. Chance,* 57 Kan. 40, 48, 45 Pac. 60 (1896). We conclude that the issue is an open question before this court and that *Hogan* is not controlling.

Defendants also argue that K.S.A. 1988 Supp. 60-249a, which requires the trier of fact to itemize its verdict in a personal injury action, does not list loss of enjoyment of life. The statute reads in part:

"(a) In any action for damages for personal injury, the verdict shall be itemized by the trier of fact to reflect the amounts, if any, awarded for:
(1) Noneconomic injuries and losses, as follows:

(A) Pain and suffering,
(B) disability,
(C) disfigurement, and any accompanying mental anguish;
(2) reasonable expenses of necessary medical care, hospitalization and treatment received; and
(3) economic injuries and losses other than those itemized under subsection (a)(2)."

Although defendants' reliance on the statute is somewhat persuasive, the language of the statute does not preclude this court from recognizing loss of enjoyment of life as a separate category of noneconomic damages, and it certainly does not preclude its consideration as an element or factor in assessing damages for one of the other types of noneconomic damages listed in subsection (a)(1). Nothing in K.S.A. 1988 Supp. 60-249a purports to restrict the categories of noneconomic damages to those listed in subsection (a)(1). If the legislature had intended to preclude by statute separate awards for loss of enjoyment of life, it could easily have done so simply by stating that noneconomic damages would be limited to those categories specified in subsection (a)(1). Thus, we conclude the statute does not resolve the issue.

Gafford and his professional corporation correctly assert that PIK Civ. 2d 9.01 does not mention loss of enjoyment of life as a compensable category of damages. However, that fact does not preclude this court from recognizing such damages in an appropriate case. Nor does it automatically render erroneous an instruction which differs from that suggested in PIK. The preface to PIK Civ. 2d reads in part: "[A] pattern instruction may not be exactly right for the evidence introduced in a particular case. The judge must analyze the issues applicable to the evidence in each case and make appropriate selections and modifications." PIK Civ. 2d Preface, p. 8. The failure of PIK to include loss of enjoyment of life in its recommended instruction on damages is not determinative. As directed in PIK, the trial judge modified the pattern instruction to fit the issues and evidence in this case.

Next, defendants argue that it is duplicative to award damages for loss of enjoyment of life in addition to the separate jury award for pain and suffering and/or disability. Defendant Gafford argues that this is especially true where, as here, the jury was not given instructions clearly defining the various subcomponents of damages it was asked to assess. We think the argument has merit.

Much has been written in recent years on the issue of whether

damages are recoverable for loss of enjoyment of life, sometimes referred to as hedonic damages, as a separate category of damages or as a component of the more traditional categories of pain and suffering and/or disability. See, *e.g.*, Hermes, *Loss of Enjoyment of Life—Duplication of Damages Versus Full Compensation*, 63 No. Dak. L. Rev. 561 (1987); Hilton and Goldstein, *Damages for the Loss of Enjoyment of Life in Personal Injury Cases*, 30 For The Defense, Nov. 1988, at 2; Staller, *Placing a Value on the Enjoyment of Life*, 31 For The Defense, June 1989, at 8; Annot., Loss of Enjoyment of Life as a Distinct Element or Factor in Awarding Damages for Bodily Injury, 34 A.L.R.4th 293.

The cases which have considered the issue generally fall into three categories: (1) those which totally reject loss of enjoyment of life as a consideration in awarding damages; (2) those which hold it is not a separate category of damages but may be considered as an element or component of pain and suffering and/or disability; and (3) those which hold loss of enjoyment of life is a separate category of damages. For an excellent and comprehensive article on the subject, see Hermes, 63 No. Dak. L. Rev. 561.

One of the strongest arguments that has been advanced as a reason for not recognizing loss of enjoyment of life as a separate category of damages is that it duplicates or overlaps other categories of damages, such as permanent disability or pain and suffering. See, *e.g.*, *Huff v. Tracy*, 57 Cal. App. 3d 939, 943, 129 Cal. Rptr. 551 (1976); *Swiler v. Baker's Super Market, Inc.*, 203 Neb. 183, 187, 277 N.W.2d 697 (1979); *Flannery v. United States*, 297 S.E.2d 433, 438 (W. Va. 1982). See generally Hermes, 63 No. Dak. L. Rev. 561. However, loss of enjoyment of life is arguably distinct from pain and suffering. Comment, *Loss of Enjoyment of Life as a Separate Element of Damages*, 12 Pac. L.J. 965, 972-73 (1981). It is also arguably distinct from loss due to disability. In *Thompson v. National R.R. Passenger Corp.*, 621 F.2d 814 (6th Cir. 1980), *cert. denied* 449 U.S. 1035 (1980), the court distinguished some of the different types of damages resulting from physical injury as follows:

"Permanent impairment compensates the victim for the fact of being permanently injured whether or not it causes any pain or inconvenience, pain and suffering compensates the victim for the physical and mental discomfort caused by the injury, and loss of enjoyment of life compensates the victim for the limitations on the person's life created by the injury." 621 F.2d at 824.

Valid arguments can be made to support all three lines of cases

which have considered damages for loss of enjoyment of life in personal injury cases. Nothing would be gained by reviewing the various cases, most of which are discussed in the Hermes article and the recent annotation in 34 A.L.R.4th 293. This court must now determine which of the various theories should be recognized in Kansas. We think the more realistic approach as a general rule is that loss of enjoyment of the pleasurable things in life is inextricably included within the more traditional areas of damages for disability and pain and suffering. While it is true that a person may recover from the physical pain of a permanent injury, the resultant inability to carry on one's normal activities would appear to fall within the broad category of disability. In the majority of cases loss of enjoyment of life as a separate category of damages would result in a duplication or overlapping of damages. Our holding on this issue is consistent with what appears to be a slight majority of the cases which have considered the various arguments and it is also consistent with the wording of K.S.A. 1988 Supp. 60-249a. However, we also point out that evidence of loss of enjoyment of life is definitely admissible and proper for the jury's consideration as it relates to disability and pain and suffering, and may certainly be argued by counsel to the jury.

We hold that in Kansas, loss of enjoyment of life is not a separate category of nonpecuniary damages in a personal injury action and that it is error to submit a separate instruction, or provide a separate verdict form entry, on loss of enjoyment of life. However, in a proper case it is a valid subcomponent or element of pain and suffering and/or disability.

Gafford also argues that there should be no recovery for loss of enjoyment of life because Shawn Leiker was not sufficiently conscious or aware of the fact she was being deprived of normal living. He contends that if she did not realize that she was being deprived of enjoyment of life, she cannot recover for it. We think this argument is negated by what is said on the next issue relating to conscious pain and suffering. The question of her awareness or realization of her condition was one for the jury.

We now turn to the question of whether the instruction in the present case constitutes reversible error. We find that it does not. Shawn Leiker remained in a semi-comatose condition for nearly six years and was totally deprived of all aspects of normal living

the entire time. The jury was carefully instructed by the learned trial judge, and the parties argued Shawn's loss of enjoyment of life as a separate and distinct category of damages. The verdict form listed "Loss of enjoyment of life" as a separate item of damages, for which the jury allowed $150,000. In *Andrews v. Mosley Well Service*, 514 So. 2d 491 (La. App. 1987), an award of $75,000 for "loss of enjoyment of life" was challenged as a duplication of pain and suffering. The appellate court affirmed the judgment and stated as one of its reasons the trial court's instruction on the issue. Under all the facts of this case, we do not think the jury could have possibly been misled or that the itemized verdict included any overlapping or duplication. The jury was instructed to consider loss of enjoyment of life separate and apart from any award for pain and suffering or disability. Considering the horrendous loss suffered by Shawn Leiker, the relatively modest award for six years' loss of any meaningful living belies any duplication in the damages awarded. Under the facts and circumstances of this case, we hold the instruction on the loss of enjoyment of life as a separate category of damages was harmless error which does not require or justify reversal.

## C. Conscious Pain and Suffering

Defendants Marshall, Gafford, and their respective professional corporations argue that it was erroneous to instruct the jury that it could award damages to Shawn Leiker's estate for pain and suffering. Marshall also argues that it was erroneous to instruct the jury that damages could be awarded for disfigurement and accompanying mental anguish.

At the outset, it should be noted that the defendants made no objection on the record to the instruction on pain and suffering. In fact, pain and suffering was included in the jury instructions proposed by the defendants. Defendants did, however, make an oral motion for a directed verdict on the issue of pain and suffering, contending that the evidence was insufficient to sustain such an award. They argued that there was no expert medical opinion offered by the plaintiffs that Shawn Leiker experienced conscious pain and suffering, and that the evidence in fact showed otherwise. The trial court denied the motion.

A party may not assign as error the giving or failure to give an instruction unless he objects to the instruction and states the specific grounds for the objection. Absent such an objection, an

appellate court may reverse only if the trial court's instruction was clearly erroneous. K.S.A. 60-251(b); *Nail v. Doctor's Bldg., Inc.*, 238 Kan. 65, 67, 708 P.2d 186 (1985). K.S.A. 1988 Supp. 60-249a(c) provides that the trial court in a personal injury action shall instruct the jury only on those items of damage upon which there is "some evidence" to base an award. Thus, if there was any evidence to support an award for pain and suffering, it was not clearly erroneous to instruct the jury that it could award such damages in compensation.

In ruling on the defendants' motion for a directed verdict on the pain and suffering issue, the trial court was required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the plaintiffs, against whom the ruling was sought. If reasonable minds could have reached different conclusions based on the evidence, the trial court was required to deny the motion and submit the matter to the jury. This same rule applies upon appellate review of a trial court decision on a motion for a directed verdict. *Holley v. Allen Drilling Co.*, 241 Kan. 707, 710, 740 P.2d 1077 (1987).

Kansas generally follows the majority rule that damages are recoverable only for pain and suffering which is consciously experienced. *Nichols v. Marshall*, 486 F.2d 791, 793 (10th Cir. 1973) (applying Kansas law); *Fogarty v. Campbell 66 Exp., Inc.*, 640 F. Supp. 953, 963 (D. Kan. 1986); *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, 69, 755 P.2d 1319 (1988); *Fudge v. City of Kansas City*, 239 Kan. 369, 380, 720 P.2d 1093 (1986); *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 448, 647 P.2d 320 (1982). See generally 22 Am. Jur. 2d, Damages §§ 241, 249. The defendants argue that the plaintiffs offered insufficient competent evidence to support an instruction permitting an award for pain and suffering, because of lack of medical or empirical evidence that Shawn Leiker realized or was aware of any pain and suffering.

Defendants are correct in arguing that the plaintiffs have the burden of establishing damages. *Short v. Wise*, 239 Kan. 171, 177, 718 P.2d 604 (1986). However, this court has never held that medical expert testimony is required in order to establish that the injured plaintiff consciously experienced pain and suffering. In fact, recent cases indicate that sufficient evidence may exist to submit the issue to the jury without any expert medical testimony on the issue.

In *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, the decedent suffered severe injuries as a result of accidental electrocution. He died ten days later. The jury award included $2,000 for pain and suffering. On appeal, the defendant contended that plaintiffs' evidence was insufficient to show the decedent experienced conscious pain and suffering before his death. This court concluded:

"We have examined the record and concluded that, although not extensive, there was sufficient evidence to justify a finding that Terry Pape suffered conscious pain and suffering from his injuries until his death. When discovered lying at the bottom of the bins, Terry Pape was breathing, had a bloody cut on his head, and was audibly moaning. In response to a request by Kathleen Pape to squeeze her hand if he understood her, Terry Pape squeezed her hand. Notes in the hospital record indicated that Terry Pape was very responsive to pain stimuli. Under the circumstances, we find that there was sufficient evidence to submit to the jury the element of damages of decedent's conscious pain and suffering and to justify an award in the amount of $2,000." 231 Kan. at 448.

This court obviously did not require expert medical testimony or "empirical data" in order to meet the threshold of sufficiency of evidence to submit the issue to the jury.

In *Fudge v. City of Kansas City*, 239 Kan. 369, the decedent was injured in a motor vehicle collision and died twenty days later of the injuries he sustained in the accident. His wife and children brought a wrongful death and personal injury survival action against the other driver and the City of Kansas City. The jury award included $50,000 for pain, suffering, disabilities, or disfigurement and any accompanying mental anguish. Defendants contended on appeal that the evidence did not support the $50,000 award. They argued that the decedent lost consciousness a few minutes after the collision and never regained consciousness, and that medical records showed he did not respond to stimuli. The defendants presented testimony by a physician that Fudge was in such a deep state of unconsciousness that he could not have felt pain. Ambulance records showed that Fudge had lapsed in and out of consciousness for a ten-minute period after the accident. Fudge's mother-in-law testified that, three days after the accident, he squeezed her fingers twice in response to things she told him about his children, and that he did so two or three more times before he died. This court concluded that the issue was controverted, presenting a fact issue for the

jury. 239 Kan. at 380. It is apparent that the plaintiffs in *Fudge* satisfied their burden of proof without either medical records *or* expert medical testimony in their favor.

In *Folks v. Kansas Power & Light Co.*, 243 Kan. 57, the decedent was fatally injured when a metal ladder he was using came into contact with defendant's power line. His surviving spouse and minor children brought a wrongful death and survival action. The jury awarded the estate $10,000 for pain and suffering. On appeal, KPL argued there was no competent evidence that Folks was conscious after the accident, and therefore the award for pain and suffering was improper. This court disagreed, citing *Pape* for its holding that, under Kansas law, lay witness testimony is admissible on the issue of consciousness. The court concluded:

"In this case, there is conflicting testimony regarding whether Folks was conscious after the accident had occurred. A police officer testified that when he arrived on the scene Folks was breathing and making incoherent noises, and appeared to be conscious. Folks' employer testified that Folks was never conscious. The jury considered the conflicting testimony, determined that Folks was conscious, and properly awarded damages for pain and suffering." 243 Kan. at 69.

In the case before us, it is undisputed that Shawn Leiker was conscious for nearly twenty minutes after the overdose of anesthetic was administered. Within a few minutes, she complained she was having difficulty breathing, and that she felt nauseated. After the baby was delivered, Shawn complained again about having difficulty breathing. As her husband and newborn baby were leaving the delivery room, Shawn again stated she could not breathe and passed out. It is clear from the evidence that Shawn was conscious and fully aware of her discomfort for at least several minutes after the anesthetic was administered.

It is also clear from the record that Shawn Leiker was permanently impaired due to lack of oxygen and resulting brain damage after she initially lost consciousness. The defendants rely solely on the decedent's physical condition *after* she lost consciousness, contending that she was incapable of experiencing pain and suffering. However, the plaintiffs presented substantial evidence to show that Shawn also experienced pain and suffering between noon on January 28, 1982, when she lost consciousness, and the date of her death on December 14, 1987.

The plaintiffs presented evidence through Dr. Marshall, as an adverse witness, that Shawn flinched the day following the

surgery when he applied skin clips to her incision. Hospital records stated that Shawn opened her eyes when her name was called and in response to physical stimuli. By early April 1982, hospital records revealed that she exhibited "increased response to painful stimuli," and consistently opened her eyes to verbal and tactile stimuli. In July 1982, hospital records indicated that, when presented with a painful stimulus, she would withdraw an extremity, flinch, or vocalize. She frequently smiled when spoken to and in response to pleasant activity and discussions. She exhibited a startled reaction in response to a sudden noise or unexpected touch.

Plaintiffs also presented testimony of Delanie Meier, a registered nurse at St. John's Hospital who was the primary care nurse in charge of Shawn's case. She reviewed the contents of the hospital records for the jury, including portions about Shawn's response to painful stimuli. She had been trained to observe patients' responses to various stimuli. She noticed Shawn smiling in response to her on many occasions. An occupational therapist noted in the records that on March 19, 1982, while exercising Shawn's upper extremities, Shawn pulled her arm away in what appeared to be a voluntary effort when the therapist ranged the arm to a painful point.

Plaintiffs also presented testimony of Dr. William Cathcart-Rake, an internist who attended Shawn from March 1982 until her death. He testified that, although Shawn had suffered brain damage from lack of oxygen, she did have some brain function, although he could not say how much. On cross-examination, Dr. Cathcart-Rake testified regarding the information he recorded in March 1982, on Shawn's admission to St. John's Hospital. He noted that Shawn had not regained consciousness following resuscitation efforts, and that she was comatose at that time. An EEG was performed on March 29, 1982, showing gross abnormalities consistent with "super coma." On his discharge summary written in July 1982, Dr. Cathcart-Rake again noted that Shawn never regained consciousness following the acute event, and that she would likely remain in a persistent vegetative state. In his neurological examination, he noted "slight responsiveness to painful stimuli." At trial he testified that her response to painful stimuli had included a slight decerebrate movement of the right leg and arm, which he defined for the jury as an

involuntary reflex type of movement. He testified that Shawn did not seem to be responsive to outside stimuli, and that, although he was not a neurologist, as far as he knew defense counsel was correct in suggesting "she would not feel a thing on a cognitive level." He also testified that he had not read all of the observations noted in the hospital records by Shawn's nurses and physical therapists.

Defendants argue in this appeal that plaintiffs' lay witness testimony regarding Shawn Leiker's responses is not competent evidence to support a finding that Shawn could consciously experience pain and suffering. As plaintiffs point out in response, however, this court has recently held that lay witness testimony is admissible on the issue of the degree of consciousness required to support damages for pain and suffering. *Folks v. Kansas Power & Light Co.*, 243 Kan. at 69. In *Nichols v. Marshall*, 486 F.2d at 793, the court held that lay witnesses are competent to report what they observe without offering medical opinions as to the consciousness of the deceased, and where the evidence is conflicting the issue is properly one for the jury. Lay witness testimony was deemed sufficient by this court in *Fudge* and *Folks* to create a jury question on the consciousness issue. The evidence of whether Shawn suffered any conscious pain and suffering was clearly conflicting and therefore presented a proper issue for the jury.

### D. Excessiveness of Jury Verdict

Defendants argue that the jury verdict must be set aside and a new trial granted because the verdict was the result of passion and prejudice on the part of the jury. In the alternative, they contend that the trial court erred in denying defendants' request for a substantial remittitur.

The jury found that Shawn Leiker had sustained a total of $1,250,000 in damages for personal injuries before she died.

The jury also found that Shawn's heirs sustained damages totalling $3,003,100, itemized as follows:

| | |
|---|---|
| Nonpecuniary damages | $2,000,000 |
| Pecuniary damages | 1,000,000 |
| Funeral expenses | 3,100 |

The trial court subsequently reduced the wrongful death award for nonpecuniary damages from $2,000,000 to $100,000 pursuant to K.S.A. 1988 Supp. 60-1903(a). Hence, although the jury verdict

totalled $3,003,100, judgment was entered for the heirs in an amount of $1,103,100 on the wrongful death claim.

The jury in this case, after hearing all the evidence, was of the opinion that a fair award for all of plaintiffs' losses was $4,253,100. Due to the legislative enactment of K.S.A. 1988 Supp. 60-1903(a), that total jury verdict was reduced approximately 45% to $2,353,100. When the wrongful death award of $3,003,100 is considered separately, we find nearly a 67% reduction. Defendants have already received, by operation of the statute, what amounts to a substantial reduction in the amount the jury found was just compensation for the clear negligence of these defendants.

The defendants collectively challenge as excessive all components of the jury verdict except Shawn's medical, hospital, and custodial care expenses; loss of services to Shawn's husband; and funeral expenses. Defendant Gafford focuses his challenge on the nonpecuniary damages, essentially arguing they were excessive. Marshall focuses his challenge primarily on the size of the verdict for the wrongful death claims. However, he also argues that there was insufficient evidence to support either the amount awarded for pecuniary damages in the wrongful death claim, or the amount awarded Shawn for her loss of income, time, and earning capacity in the personal injury claim.

In the recent case of *Tetuan v. A. H. Robins Co.*, 241 Kan. 441, 480, 738 P.2d 1210 (1987), this court summarized the rules applicable to a challenge of a verdict as excessive:

"Where a charge of excessive verdict is based on passion or prejudice of the jury but is supported solely by the size of the verdict, the trial court will not be reversed for not ordering a new trial, and no remittitur will be awarded unless the amount of the verdict in light of the evidence shocks the conscience of the appellate court. *Cantrell v. R. D. Werner Co.*, 226 Kan. at 686. Where the alleged passion or prejudice of the jury is not shown by definite proof, but depends for support solely on the size of the verdict, the award will be upheld unless it shocks the conscience of the court. *Henderson v. Hassur*, 225 Kan. 678, 594 P.2d 650 (1979). There is no simple, symmetrical pattern or design for determining whether a verdict is sufficient or insufficient, since each case must stand on its own facts. *McGuire v. Sifers*, 235 Kan. 368, 681 P.2d 1025 (1984)."

See *O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. [Kan.] 1987), *cert. denied* 486 U.S. 1032 (1988).

Based upon the facts presented in the case before us, the amount of the jury verdict does not shock the court's conscience.

The jury awarded $1,250,000 to Shawn Leiker's estate to compensate for the personal injuries and accompanying noneconomic losses she incurred throughout the period of nearly six years before she died, as a result of the defendants' negligence. The jury award to her heirs for wrongful death, as remitted by the court pursuant to statute, totalled $1,103,100, including $1,000,000 for pecuniary loss. The amount for pecuniary loss included compensation to the two small children for their loss of parental care and attention, loss of maternal training and guidance, and loss of financial support the decedent would have provided them had she lived. It also included compensation to James Leiker, Shawn's husband, for loss of attention, care, and services, and for loss of earnings she would have provided. *Wentling v. Medical Anesthesia Services*, 237 Kan. 503, 507-09, 701 P.2d 939 (1985); K.S.A. 1988 Supp. 60-1904. There was testimony by plaintiffs' expert witness that a conservative estimate of the present value of Shawn's anticipated lifetime earning capacity alone exceeded $1,000,000. The expert also testified that the present value of the household and family care services she would have provided between ages 24 and 70 was $556,335. He reduced the totals by $213,303 as the estimated present value of Shawn's lifetime personal consumption, concluding that the total pecuniary loss for earning capacity and household and family care services was $1,633,055. There was sufficient evidence to support the jury verdict of $1,000,000 for pecuniary loss in the wrongful death action. For nonpecuniary loss to the heirs for Shawn's wrongful death, the statutory maximum of $100,000 is not an excessive sum to compensate her husband and two small children for mental anguish, bereavement, loss of society, and loss of companionship resulting from her death.

Gafford also argues that the trial court erred in referring to Shawn Leiker in one of the numerous jury instructions as the one "who was killed," contending this phrase incited passion and prejudice on the part of the jury and led to an excessive award. There is nothing in the record to support the allegations and argument of Gafford. The challenged language was unnecessary and perhaps should not have been used, but when the instructions are read as a whole the language has not been shown to be prejudicial to the defendants under the facts and circumstances presented in this case. *Trout v. Koss Constr. Co.*, 240 Kan. 86, 88-89, 727 P.2d 450 (1986).

The plaintiffs in this action suffered a total disruption of their lives for a period of nearly six years. The survivors have continued to suffer the loss of a wife and mother. Shawn remained in a comatose or semi-comatose condition throughout that entire time, and was deprived of every enjoyable element of living. The judgments do not shock the conscience of this court and, as they are amply supported by the evidence, the defendants' requests for a new trial or a substantial remittitur must be denied.

E. <u>Presumption of Careful Treatment</u>

Marshall and Gafford both claim that the trial court committed reversible error by failing to give the following instruction, which they had requested:

"In medical malpractice actions, the physician or surgeon is presumed to have carefully treated or operated on his patient and there is no presumption of negligence from the fact of an injury or adverse result. The physician or surgeon is not a guarantor of good results, and civil liability does not arise merely from bad results, or if bad results are due to some cause other than treatment."

Defendants Marshall and Gafford rely on a long string of Kansas cases in which this court has stated that, in medical malpractice actions, the physician or surgeon is presumed to have carefully and skillfully treated or operated on his patient, and that there is no presumption of negligence from the fact of an injury or adverse result. See, *e.g.*, *Webb v. Lungstrum*, 223 Kan. 487, 489, 575 P.2d 22 (1978); *Tatro v. Lueken*, 212 Kan. 606, 611, 512 P.2d 529 (1973); *Collins v. Meeker*, 198 Kan. 390, 394-95, 424 P.2d 488 (1967); *Voss v. Bridwell*, 188 Kan. 643, 658-59, 364 P.2d 955 (1961); *Rhodes v. DeHaan*, 184 Kan. 473, 476, 337 P.2d 1043 (1959); *Goheen v. Graber*, 181 Kan. 107, 111-12, 309 P.2d 636 (1957); *Waddell v. Woods*, 158 Kan. 469, 474, 148 P.2d 1016 (1944).

The cases cited by the defendants involved the doctrine of *res ipsa loquitur*, and the presumption of careful treatment was discussed in determining the applicability of the doctrine. None of the cases relied upon by the defendants supports their requested instruction. Here, plaintiffs relied upon specific allegations of negligence supported by expert testimony, not upon the doctrine of *res ipsa loquitur*.

Under these circumstances, an instruction that a "physician or surgeon is *presumed* to have carefully treated or operated on his

patient and there is no presumption of negligence from the fact of an injury or adverse result" could have misled the jury into believing that the plaintiffs' burden of proof was greater than a preponderance of the evidence. The defendants cite no case holding that the failure to so instruct constitutes reversible error, nor has our research disclosed any such case.

The trial court properly instructed the jury in this case that the plaintiffs had the burden of establishing their claims of medical negligence. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). The jury was not left with the impression that Shawn Leiker's injuries alone raised a presumption of negligence. The trial court did not err in refusing the instructions requested by Marshall and Gafford to the effect that there was a presumption that the defendants were not negligent.

### F. Duty Undertaken by Gafford as Anesthetist

Defendant Gafford and his professional corporation contend that the trial court gave erroneous instructions to the jury regarding the nature of the duty owed by Gafford, a certified registered nurse anesthetist, to his patient. The challenged instructions read as follows:

"Instruction No. 11

"Instructions herein which refer to the duties of a physician or surgeon apply to others (such as a nurse anesthetist) who undertake to perform the duties of a physician or surgeon."

"Instruction No. 17

"The laws of Kansas provide:

'All anesthetics shall be given by a physician or shall be given under the supervision of a physician.'

"The word 'supervision' in this context is to be given its usual and ordinary meaning. The Random House Dictionary of the English Language - Second Edition - Unabridged - Copyright 1987, gives the following definitions:

'supervision: the act or function of supervising';

'supervising: to oversee (a process, work, workers, etc.) during execution or performance; superintend; have the oversight and direction of.'

"In determining whether the defendants complied with the requirements of this law you may consider all the evidence in the case introduced on that point. The burden on this issue is upon the plaintiff. If you find that either or both Marshall or Gafford failed to comply with the requirement, you must further find that had they complied more probably than not, Shawn A. Leiker would not have sustained injury and death."

Gafford timely objected to both instructions before the trial court. However, most of the numerous arguments advanced by

Gafford in his brief were not raised below. At trial, Gafford objected to Instruction No. 11 simply as being "too encompassing." Counsel argued that the instruction should have indicated that a nurse anesthetist is to be judged by the same standards as an *anesthesiologist*, not a "physician or surgeon." When Gafford objected to Instruction No. 17, counsel simply adopted the arguments that had previously been raised about that instruction by Marshall. Marshall objected to Instruction No. 17 on the basis that it provided a dictionary definition of the word "supervision" rather than deferring to expert medical testimony for the purpose of determining whether there was a failure to supervise. To the extent that Gafford raises other arguments not presented to the trial court, they may not serve as the basis for assigning error unless the instruction was clearly erroneous. *Tetuan v. A. H. Robins Co.*, 241 Kan. at 467; K.S.A. 60-251.

Instruction No. 11 was not fatally flawed for failing to specify that Gafford would be held to the duties of an anesthesiologist rather than those of a physician or surgeon generally. Since the evidence showed that Gafford undertook only the responsibility of administering and monitoring the anesthesia necessary for Shawn Leiker's cesarean section, it is implicit in the instruction that he will be held to the duties of a member of that particular school of medicine. This is especially true when the challenged Instruction No. 11 is read in conjunction with Instruction No. 10, which refers to specialists in the same field of expertise. Also, Instruction No. 15 clearly delineated the respective specialties of Marshall and Gafford. Considering the limited objections lodged by Gafford, we find no error in Instruction No. 11.

Instruction No. 17 was based upon K.A.R. 28-34-17(p), which is one of several rules applicable to hospitals providing surgical care. While the regulations apply basically to the licensing of hospitals pursuant to K.S.A. 65-425 *et seq.* and the duties imposed upon such hospitals, the regulations may also apply to other health care providers, such as the defendants here, who seek to utilize the facilities of the hospital.

The only objection asserted by Gafford to Instruction No. 17 was to adopt Marshall's previous contention that it failed to limit the jury to expert testimony in determining whether Gafford administered the anesthetic under the "supervision" of Marshall. Gafford argues that the "abstract concept" of supervision of

one professional by another, within the specialized environment of the hospital operating room, is not within the common knowledge of the public generally. He argues that it was erroneous to provide the jury with a dictionary definition of the term "supervise" instead of directing the jury to consider the question on the basis of pertinent expert testimony, which was plentiful in this case.

Gafford concedes, however, that Instruction No. 9 required the jury to rely only on expert testimony in determining whether a health care professional complied with the appropriate standard of care with respect to questions of a medical or scientific nature. That instruction specifically informed members of the jury they were not permitted to arbitrarily set a standard of their own or determine the question based upon their personal knowledge. When all of the instructions are read together as a whole, and considering the overwhelming evidence of negligence in this case, we cannot say that Instruction No. 17 resulted in any reversible error.

### G. Marshall's Duty to Supervise Anesthesia

Marshall and his professional corporation also argue that it was erroneous to give Instruction No. 17 to the jury, absent expert medical testimony defining the conduct required by K.A.R. 28-34-17(p). He argues that the plaintiffs presented no expert testimony defining what a supervising physician should or should not do to comply with the regulation. As did Gafford, Marshall complains that the trial court gave the jury a dictionary definition of the term "supervision."

The general standard of care required of a doctor is that he possess the reasonable degree of learning and skill ordinarily possessed by members of the profession and of his particular school of medicine in the community where he practices, or in similar communities, and that he will use such learning and skill in treating his patient with ordinary care and diligence. *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 49, 510 P.2d 190 (1973); *Goheen v. Graber*, 181 Kan. 107, ¶ 1. In the instant case, Instruction No. 17 was given on the assumption that K.A.R. 28-34-17(p) imposes a duty on physicians to supervise the administration of anesthesia by non-physicians working under their control. At oral argument before this court, counsel for Dr. Marshall candidly admitted that the regulation was applicable to Marshall.

Marshall concedes there was expert medical evidence on the question of whether he complied with the alleged obligation to supervise Gafford's administration of the anesthesia. However, he argues that expert testimony was needed to indicate the specific obligations imposed on a surgeon by the supervision requirement of the regulation. We disagree. The specific duties falling under the general umbrella of "supervision" did not need to be detailed to the jury in order to permit an intelligent decision on whether Marshall failed to supervise the administration of anesthesia in this case. There was conflicting testimony from expert witnesses as to whether Marshall appropriately supervised Gafford. In addition, it was undisputed that Marshall was waiting in the doctors' lounge while Gafford injected the anesthetic, and Marshall was not even present until after the procedure had been completed.

It was not necessary for the plaintiffs to put on expert testimony explaining in detail the specific responsibilities of "supervision" in order to present the jury with the issue of whether Marshall failed to comply with the regulation. Marshall's arguments on this issue lack merit.

### H. Marshall's Objections to Instruction No. 2

The next five issues raised by Marshall all appear to involve Instruction No. 2 and its recitation of the allegations of negligence asserted by the plaintiffs. Although each issue is addressed separately by Marshall in his briefs, the arguments are similar and we will consider the issues together. We note at the outset that, since Marshall did not object to the instruction at trial, he may not assign as error the giving of the instruction unless it was clearly erroneous. K.S.A. 60-251(b).

Instruction No. 2 was a lengthy general instruction outlining the various claims and allegations of the plaintiffs and the asserted acts of negligence of each defendant. In the instruction, the court explained the general nature of the claims and then listed thirteen specific allegations of negligence against Gafford and his professional corporation. The instruction then addressed plaintiffs' claims against Marshall, including ten specific allegations, which read in pertinent part:

"The claims against George W. Marshall, M.D., and Harris, Hodges & Marshall, Chartered, are based on the failure of George W. Marshall, M.D. to comply

with standard medical practice which caused or contributed to the injuries and death of Shawn A. Leiker in one or more of the following particulars:

. . . .

"3. Failure to determine the proper amount of tetracaine to be administered for cesarean section and to prevent defendant Gafford from administering an overdose thereof.

"4. Failure to be present when defendant Gafford commenced the anesthesia procedure on Mrs. Leiker.

"5. Failure to monitor fluid intake and require an adequate pre-load.

. . . .

"7. Failure to detect, diagnose, and promptly treat Shawn A. Leiker's distress during and after the cesarean section.

"8. Failure to promptly and properly resuscitate Shawn A. Leiker."

Following the allegations against Marshall, the instruction concluded by stating:

"The plaintiffs have the burden to prove their claims of medical negligence of the defendants and that they caused or contributed to the injury and death of Shawn A. Leiker before damages can be recovered. To sustain this burden, it is not necessary that they establish each claim of medical negligence only that as to each defendant, one or more of those claims be proved.

"The defendants all deny that they committed any acts of medical negligence as alleged by the plaintiffs which caused or contributed to the injury and death of Shawn Leiker."

Marshall's principal argument as to each of the five specified allegations of negligence is that there was insufficient expert testimony for any of the five allegations to be submitted to the jury. We do not agree. This case was replete with expert testimony on the various issues asserted by the parties. Numerous experts testified on behalf of plaintiffs and defendants. All were subjected to intense cross-examination. Without going into detail on each of the five allegations of negligence, our review of the record does disclose expert testimony on each issue sufficient to warrant their submission to a jury. For example, on the issue of the proper dosage of tetracaine (subsection 3 of Instruction No. 2), Dr. Bassell, plaintiffs' expert, testified that an obstetrician-gynecologist has a duty to see that an unsafe dosage of an anesthetic drug is not administered by a nurse anesthetist. Furthermore, Dr. Mathewson testified on cross-examination by plaintiffs' counsel that there should be communication between the obstetrician and nurse anesthetist regarding the anesthetic that will be used and the dosage level to be administered. Comparable evidence was presented on each of the five allegations of negligence that Marshall asserts should not have gone to the jury.

Instruction No. 2, commonly referred to as the issues instruction, essentially informed the jury that plaintiffs claimed Marshall was negligent for failing to comply with standard medical practice, which in turn allegedly caused injury and death to Shawn Leiker. Marshall has not shown that he was prejudiced just because the instruction listed the specific allegations of fault claimed by the plaintiffs. At the end of the instruction, the jury was informed that the plaintiffs were not required to establish each specific claim of medical negligence in order to meet their burden of proof but that they must prove one or more to the satisfaction of the jury. The jury was also provided Instruction No. 9, which required the jury to defer to expert medical testimony in determining whether the standard of care had been met on questions of a medical or scientific nature. When read in context and in conjunction with the other jury instructions, Instruction No. 2 was not clearly erroneous. We conclude the trial court did not commit error in instructing the jury on the alleged acts of negligence attributed to Marshall.

## I. Marshall's Liability for Gafford's Negligence

The jury in answer to a special question on the verdict form found Marshall to be legally responsible for one or more acts of Gafford. Marshall goes to great lengths in his briefs to argue that he should not be held "vicariously" liable for any of the negligent acts of Gafford.

At the outset it is clear that one of the plaintiffs' principal allegations against Marshall was that he violated his duty to supervise and control the administration of anesthesia by Gafford. That he had such a separate and independent duty is clear. *McCullough v. Bethany Med. Center,* 235 Kan. 732, 738, 683 P.2d 1258 (1984); K.A.R. 28-34-17(p).

Vicarious liability is a term generally applied to legal liability which arises solely because of a relationship and not because of any actual act of negligence by the person held vicariously liable for the act of another. It is also referred to as imputed negligence or imputed liability. Vicarious liability depends upon the relationship of the parties, such as employer and employee or principal and agent. In such cases, the employer or principal is held liable for the negligent act of the employee or agent solely by reason of the relationship and not because the employer or

principal actually committed an act of negligence. For discussions of the distinction between vicarious liability and the independent liability of an employer or principal see Prosser and Keeton on Torts, ch. 12, §§ 69-71 (5th ed. 1984); 53 Am. Jur. 2d, Master and Servant § 404 *et seq.*

In the present case, even though the jury answered the question in the affirmative, the thrust of plaintiffs' case is that Marshall breached an affirmative duty to supervise Gafford, failed to take appropriate action when he discovered Shawn Leiker was in trouble, and was guilty of negligence for his own acts as well as one or more of the acts of Gafford.

Marshall's arguments and contentions on the issue of "vicarious liability" are difficult to follow. He first contends that he was not vicariously liable for Gafford's negligence because he merely had the duty to *supervise* Gafford and not the duty to *control* Gafford's work. While he admits his own professional corporation is vicariously liable for Gafford's negligence, he contends he is not personally liable since he was merely a co-employee of the corporation with a duty to supervise Gafford.

Second, Marshall argues that neither he nor his professional corporation may be held vicariously liable for the wrongful death judgment because of K.S.A. 1988 Supp. 40-3403(h), which limits vicarious liability among health care providers qualified for coverage under the Health Care Stabilization Fund for all claims filed after July 1, 1986, the effective date of the statute. Each argument will be addressed briefly.

The jury was provided the following pertinent instruction:
"Instruction No. 16

"On your verdict form you will be required to determine whether or not defendant Gafford was the agent or servant of the defendant Marshall.

"In determining whether a person is the servant of another, sometimes called the master, it is necessary that he not only be subject to the latter's control or right of control with regard to the work to be done and the manner of performing it, but that this work is to be performed on the business of the master or for his benefit. Actual control, of course, is not essential. It is the right to control which is determinative.

"In determining whether or not defendant Gafford was acting as agent for defendant Marshall, you are instructed that an agent is a person who, by agreement with another called the principal, performs or is to perform services for the principal, with or without compensation. The agreement may be written, oral, or implied by the behavior of the parties."

The jury was also instructed as follows:

"Instruction No. 14

"A physician or surgeon must exercise due care in selecting his assistants including an agent or employee working under him such as a nurse anesthetist and if he fails to do so he may be liable for the negligence or fault of the nurse anesthetist for injuries resulting therefrom."

The parties stipulated, and the jury was so instructed, that Gafford was the agent and employee of his professional corporation and that Marshall was the agent and employee of his professional corporation. At trial, Marshall did not object to any of these instructions.

The following special question was submitted to the jury on the verdict form: "Do you find that Dr. George W. Marshall is legally responsible for one or more of the acts of Wendell P. Gafford which caused the injury and death of Shawn Leiker?" The record does not reflect any request by Marshall that the verdict form require the jury to specify the acts for which the jury found him responsible in the event the submitted question was answered in the affirmative. The jury did answer the question in the affirmative and Marshall cannot now complain about the jury's failure to specify any particular act of negligence. Nor can we speculate on the negligent acts of Gafford for which the jury found Marshall responsible. Suffice it to say the jury did find as a fact that Gafford was negligent, that Gafford was acting as the agent of Marshall, and that Marshall was responsible for one or more of Gafford's acts. Such a conclusion is adequately supported by the evidence, as is the jury's conclusion that Marshall was negligent in his own right for one or more of the acts of negligence attributed to him. The answer to the special question merely determined that Gafford was the agent of Marshall, nothing more.

In *McCullough v. Bethany Med. Center*, 235 Kan. 732, this court discussed the legal relationship between a physician and a nurse anesthetist. This court noted: "[A] surgeon usually is liable for the negligence of an anesthetist-resident or a nurse-anesthetist under the doctrine of 'captain of the ship' which still pertains in most states. 8 Am. Jur. Proof of Facts 2d, Anesthetist Supervision and Control § 1, p. 587." 235 Kan. at 738.

This court went on to note that the determination of the right of control is a matter for the trier of fact. In addition, as mentioned

earlier, Marshall conceded at oral argument that K.A.R. 28-34-17(p) applied to him. We find no merit to this argument of Marshall.

Marshall also argues that K.S.A. 1988 Supp. 40-3403(h) precludes vicarious liability for the wrongful death judgment. The statute reads:

"(h) A health care provider who is qualified for coverage under the [Health Care Stabilization Fund] shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after the effective date of this act [July 1, 1986]."

Nothing in the statute abrogates the duty owed by a health care provider in tending to the needs of a patient. See K.S.A. 17-2715.

Marshall asked the trial court to instruct the jury that, as a matter of law, Marshall and his professional corporation could not be vicariously liable for the misconduct of Gafford, citing the quoted statute. The trial court correctly noted that the personal injury action arose prior to the effective date of the statute, and therefore the statute, if applicable at all, could only apply to the wrongful death claim. The trial court noted that the issue of Marshall's liability for Gafford's negligence was being submitted to the jury on the theory of principal and agent, and that the parties could address the issue after the jury verdict if it made any difference in the outcome. Marshall argued in his motion for new trial that the statute did apply to the wrongful death claim. As noted earlier, Marshall made no request that the verdict form indicate the particular negligent acts of Gafford for which the jury found Marshall responsible. Likewise, there was no request that the jury specify the separate acts of negligence attributed by plaintiffs to Marshall. Absent any such requests, Marshall is in no position to assert reversible error in the verdict returned by the jury. See K.S.A. 60-249(a); *Wozniak v. Lipoff*, 242 Kan. 583, 593, 750 P.2d 971 (1988). Even though the jury found that Marshall was legally responsible for one or more acts of Gafford, it also apparently determined that Marshall was 10% at fault based on one or more independent acts of negligence attributed to Marshall. Certainly the evidence would support such findings. It would appear that the answer to the special question would only become relevant in the event Marshall was found 0% liable for his own actions or if Gafford was unable to respond for the fault

attributed to him. Then "vicarious" liability could arise based upon the principal and agent relationship discussed in Instruction No. 16 and the jury's finding. Under all of the facts and circumstances of this case, any error which may have occurred on this issue is indeed harmless.

We have carefully considered all of the arguments and issues asserted by the defendants Marshall and Gafford in their appeals, whether discussed at length herein or not, and find no error requiring a reversal of the verdict and judgment.

## II. PLAINTIFFS' CROSS-APPEAL AGAINST GAFFORD AND MARSHALL

### Is K.S.A. 1988 Supp. 60-1903 Unconstitutional?

The plaintiffs cross-appeal against defendants Gafford and Marshall and their respective professional corporations, contending that the trial court erred in applying K.S.A. 1988 Supp. 60-1903 to reduce the jury award of nonpecuniary damages for wrongful death. The trial court reduced the jury verdict of $2,000,000 for nonpecuniary damages to $100,000, the maximum amount recoverable for nonpecuniary loss under the statute. Plaintiffs argue that the damage cap imposed by K.S.A. 1988 Supp. 60-1903 is unconstitutional.

The challenged statute reads in part as follows:

"**Amount of damages; jury instructions; itemized verdict.** (a) In any wrongful death action, the court or jury may award such damages as are found to be fair and just under all the facts and circumstances, but the damages, other than pecuniary loss sustained by an heir at law, cannot exceed in the aggregate the sum of $100,000 and costs.

"(b) If a wrongful death action is to a jury, the court shall not instruct the jury on the monetary limitation imposed by subsection (a) upon recovery of damages for nonpecuniary loss. If the jury verdict results in an award of damages for nonpecuniary loss which, after deduction of any amounts pursuant to K.S.A. 60-258a and amendments thereto, exceeds the limitation of subsection (a), the court shall enter judgment for damages of $100,000 for nonpecuniary loss."

Plaintiffs argue in their brief that the statute violates (1) the constitutional right to equal protection of the law under Sections 1 and 2 of the Bill of Rights of the Kansas Constitution and the equal protection clause of the Fourteenth Amendment to the United States Constitution; (2) the constitutional right to trial by jury as provided by Section 5 of the Kansas Bill of Rights and the Seventh Amendment to the United States Constitution; and (3) the constitutional right to remedy by due course of law under

Section 18 of the Kansas Bill of Rights. In their post-trial motion raising the constitutional issue before the trial court, plaintiffs challenged the statute on the basis of §§ 1, 5, and 18 of the Kansas Bill of Rights and the Fourteenth Amendment to the United States Constitution. To the extent that plaintiffs' arguments raise points not presented to the trial court, they are barred from presenting those points for the first time on appeal. *Kansas Dept. of Revenue v. Coca Cola Co.*, 240 Kan. 548, 552, 731 P.2d 273 (1987).

The trial court reasoned that the damage limitation itself is not unconstitutional because there was no cause of action at common law for wrongful death. As the cause of action was created by statute, the court concluded that the $100,000 limitation itself is not unconstitutional. In regard to the statutory bar against informing the jury about the $100,000 limitation, the court reasoned that, if the legislature can take away entirely the right to trial by jury in wrongful death actions or abolish the action altogether, it cannot be unconstitutional to withhold information from the jury about the dollar limitation on nonpecuniary damages.

Before addressing the specific arguments of plaintiffs, a brief review of the adoption of the English common law is deemed appropriate. K.S.A. 77-109 provides:

"The common law as modified by constitutional and statutory law, judicial decisions, and the conditions and wants of the people, shall remain in force in aid of the General Statutes of this state; but the rule of the common law, that statutes in derogation thereof shall be strictly construed, shall not be applicable to any general statute of this state, but all such statutes shall be liberally construed to promote their object."

A comparable statute was adopted by the first territorial legislature of the Kansas Territory effective November 1, 1855, and has been the law of Kansas, in one form or another, ever since. For an excellent history of the common law and its adoption and application in the State of Kansas see *Clark v. Allaman*, 71 Kan. 206, 80 Pac. 571 (1905), where the subject is discussed at length. In *Clark*, the court stated:

"It will not be denied that in every state particular rules of the common law, as it existed in England prior to the fourth year of the reign of James I, are not consciously regarded as binding; many others are consciously rejected, and new rules, the product of American conditions, departing widely from the English common law in fact, and quite indifferent to it in theory, became established and

must be recognized as of controlling authority. Rules of law have their birth, growth and decay, like generations of men, and in order to meet the expanding needs of the inhabitants of the young commonwealth the legislature enacted the statute of 1868 continuing in force the common law only as modified by constitutional and statutory law, judicial decisions, and the condition and wants of the people." 71 Kan. at 229-30.

In *Gonzales, Administrator v. Atchison, T.& S.F. Rly Co.*, 189 Kan. 689, 695, 371 P.2d 193 (1962), the court said:

"From the beginning of our history as a state (Territorial Laws 1855, ch. 96, Laws 1862, ch. 135, G.S. 1935, 77-109) the common law of England has been the basis of the law of this state, and except as modified by constitutional or statutory provisions, by judicial decisions, or by the wants and needs of the people, it has continued to remain the law of this state."

The plaintiffs go to great lengths in their brief to persuade this court that there never was a common-law rule precluding civil recovery for wrongful death. The apparent purpose of this argument is to avoid Kansas case law which holds that the Bill of Rights of the Kansas Constitution preserves the right to trial by jury (§ 5) and the right to remedy by due course of law (§ 18) only as to civil causes of action that were recognized as justiciable by the common law as it existed at the time our constitution was adopted. See *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 342, 757 P.2d 251 (1988); *In re Estate of Suesz*, 228 Kan. 275, 277, 613 P.2d 947 (1980); *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, Syl. ¶ 1, 602 P.2d 1299 (1979); *In re Rome*, 218 Kan. 198, 204, 542 P.2d 676 (1975); *Craig v. Hamilton*, 213 Kan. 665, 670, 518 P.2d 539 (1974); *Kimball and others v. Connor, Starks and others.*, 3 Kan. 414, 428 (1866). Plaintiffs ask this court to reverse longstanding Kansas law holding that there was no right at common law to recover for wrongful death, and then to strike down a damages limitation imposed by the very statute that itself abrogated the common-law rule which plaintiffs so vehemently criticize.

Plaintiffs' lengthy arguments are not persuasive. Neither the historical roots of the common-law rule precluding civil recovery for wrongful death, nor its possible lack of merit or logical basis, are relevant to the question before this court. For a comprehensive treatment of the subject, readers are directed to 1 Speiser, Recovery for Wrongful Death 2d, ch.1 (1975). Our cases are clear that, right or wrong, Kansas common law did not recognize a civil claim for wrongful death at the time our Bill of Rights was

adopted. See *Goodyear, Administratrix, v. Railway Co.*, 114 Kan. 557, 561-62, 220 Pac. 282 (1923); *City of Eureka v. Merrifield*, 53 Kan. 794, 798-99, 37 Pac. 113 (1894); *McCarthy, Adm'r, v. Railroad Co.*, 18 Kan. 46, 48 (1877). The cause of action for wrongful death is purely a creature of statute in Kansas. Since there was no cause of action for wrongful death at common law, neither § 5 nor § 18 of the Bill of Rights can be invoked to challenge the constitutionality of either the $100,000 limitation on nonpecuniary damages resulting from wrongful death, or the prohibition against informing the jury of the statutory limit.

Nor may plaintiffs invoke the right to jury trial as guaranteed by the Seventh Amendment to the United States Constitution. The Seventh Amendment has not been applied to the states through the Fourteenth Amendment. *Colgrove v. Battin*, 413 U.S. 149, 169 n.4, 37 L. Ed. 2d 522, 93 S. Ct. 2448 (1973) (Marshall, J., dissenting), and cases cited therein; *Walker v. Sauvinet*, 92 U.S. 90, 23 L. Ed. 678 (1875); *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 622, 602 P.2d 1299 (1979). It therefore applies only to limit actions of the federal government, and does not apply to state court proceedings.

Other parties have failed in their attempts in other jurisdictions to bypass statutory limitations on wrongful death damages by asking the court to recognize a cause of action at common law for wrongful death. See *Butler v. Chicago Transit Auth.*, 38 Ill. 2d 361, 363, 231 N.E.2d 429 (1967); *Hall v. Gillins*, 13 Ill. 2d 26, 28-29, 147 N.E.2d 352 (1958); *Jirsa v. Ice*, 88 S.D. 209, 217 N.W.2d 465 (1974).

The only remaining basis raised by the plaintiffs for their constitutional attack on K.S.A. 1988 Supp. 60-1903 is the equal protection clause of the Fourteenth Amendment to the United States Constitution and its counterpart in § 1 and § 2 of the Bill of Rights of our Kansas Constitution. Plaintiffs contend that the statute violates the right to equal protection because it improperly distinguishes between wrongful death claimants and other tort claimants, whose damages as a general rule have not been statutorily limited.

Equal protection analysis must begin with a determination of the applicable level of judicial scrutiny to be applied to a statute that distinguishes between classes of individuals. *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 616-17, 576 P.2d 221 (1978).

Plaintiffs urge this court to apply a "heightened scrutiny" analysis in this case, as was done in the principal opinion of this court in *Farley v. Engelken*, 241 Kan. 663, 670-71, 740 P.2d 1058 (1987), apparently on the reasoning that the limit on nonpecuniary damages impinges on the fundamental right to a jury trial. Defendants and *amici*, however, argue that heightened scrutiny is inappropriate in the instant case. They contend that the traditional rational basis test should be applied. We agree. It may be noted that in *Farley* only two justices, one of whom is no longer on the court, adopted a heightened scrutiny test, while five justices recognized the rational basis test as being appropriate. We have already concluded that the constitutional right to a jury trial is not impinged by K.S.A. 1988 Supp. 60-1903(a) and plaintiffs offer no other reason for applying heightened scrutiny analysis. The statute does not create the kind of "suspect classification" that has triggered strict or heightened scrutiny by the United States Supreme Court. See *Farley v. Engelken*, 241 Kan. at 669-70; *State ex rel. Schneider v. Liggett*, 223 Kan. at 617; *cf. Pollock v. Denver*, 194 Colo. 380, 572 P.2d 828 (1977). The "reasonable basis" or "rational basis" test traditionally has been applied where equal protection challenges have been brought against social and economic legislation. *McGowan v. Maryland*, 366 U.S. 420, 425-26, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961); *Farley v. Engelken*, 241 Kan. at 669. A statutory limitation on liability has been held a classic example of economic regulation. *Duke Power Co. v. Carolina Env. Study Group*, 438 U.S. 59, 83, 57 L. Ed. 2d 595, 98 S. Ct. 2620 (1978). A statutory limit imposed on nonpecuniary damages in wrongful death cases has been said to be designed at least in part to preclude a jury from awarding an excessive amount of damages out of sympathy for a decedent's family and would appear to fall under the general heading of social and economic legislation. *Benton v. Union Pac. R. Co.*, 430 F. Supp. 1380, 1385-86 (D. Kan. 1977); 1 Speiser, Recovery for Wrongful Death 2d §§ 7:1, 7:4.

The "reasonable basis" test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. The state legislature is presumed to have acted within its constitutional power, even if the statute results in some inequality. Under the reasonable basis test, a statutory discrimination will not be set aside if any

state of facts reasonably may be conceived to justify it. *McGowan v. Maryland*, 366 U.S. at 425-26; *Farley v. Engelken*, 241 Kan. at 669; *State ex rel. Schneider v. Liggett*, 223 Kan. at 616.

If the legislature's objective was indeed to prevent juries from awarding excessive damages out of sympathy for a decedent's family, and assuming that goal is a legitimate one, imposing a statutory cap of $100,000 on damages for nonpecuniary harm would appear to be rationally related to that goal. *Amici* suggest that the legislature sought to limit damages for nonpecuniary injuries because such harm suffers from inherent difficulties of quantification and proof. If so, imposing a statutory limit on nonpecuniary damages, while providing unlimited recovery of pecuniary losses, is a legislative strategy that is rationally related to that purpose.

Under the reasonable basis test, it is unnecessary to ascertain the specific purpose the Kansas Legislature espoused, if any, in establishing the challenged classification. Rather, if *any* state of facts reasonably may be conceived to justify the alleged statutory discrimination, the statute will not be set aside as a violation of equal protection. *McGowan v. Maryland*, 366 U.S. at 426.

A statute comes before the court cloaked in a presumption of constitutionality, and it is the duty of the party attacking the statute to sustain the burden of proof. *State ex rel. Schneider v. Liggett*, 223 Kan. at 616, and cases cited therein. The plaintiffs in the instant case have fallen short of this burden, and have not shown that the statutory limit on nonpecuniary damages in a wrongful death action violates either the Kansas or the United States Constitutions for any of the reasons advanced.

Other jurisdictions have upheld statutes imposing limits on damages for wrongful death over various constitutional arguments. See *Pollock v. Denver*, 194 Colo. 380 (equal protection); *Butler v. The Chicago Transit Auth.*, 38 Ill. 2d 361 (equal protection); *Goldstein v. Hertz Corp.*, 16 Ill. App. 3d 89, 305 N.E.2d 617 (1973) (right to remedy for injuries); *Glick v. Ballentine Produce Incorporated*, 396 S.W.2d 609, 615-16 (Mo. 1965) (right to remedy for every injury, due process, and equal protection).

We now turn specifically to the argument that the statute violates the right to trial by jury because it prohibits the court from informing the jury about the cap on nonpecuniary damages.

Both Illinois and New Hampshire have similar provisions in their wrongful death statutes which provide that a jury shall not be informed of the statutory limitation. Ill. Rev. Stat. ch. 70 ¶ 2 (1987); N.H. Rev. Stat. Ann. § 556.13 (1974). New Hampshire has upheld its statute over various constitutional arguments and the contention that the jury must be advised of the limitations. *Gibbs v. Prior*, 107 N.H. 218, 220 A.2d 151 (1966). The New Hampshire court reasoned:

"Knowledge of a statutory limitation upon the amount of recovery is not essential to the proper performance of its task by the jury, nor is authority to impart that knowledge to a jury an essential attribute of the judicial power. Jurors may determine the guilt or innocence of a prisoner without being informed of the penalty for guilt. Like the court-made rule which keeps from the jury knowledge of the existence of insurance in automobile cases, the 1963 statute is designed to exclude from the trial considerations which may reasonably be thought unnecessary to performance of the jury's function, ordinarily irrelevant to the issues before it for decision, and sometimes fraught with the risk of misuse. We think the statute valid . . . ." 107 N.H. at 221.

We conclude K.S.A. 1988 Supp. 60-1903 is not unconstitutional on any of the grounds asserted by the plaintiffs.

### III. APPEALS INVOLVING ABBOTT LABORATORIES
#### A. Plaintiffs' Appeal of Directed Verdict

Plaintiffs have separately filed what they denominate as a "contingent" appeal from the directed verdict rendered in favor of Abbott at the close of the plaintiffs' evidence. The plaintiffs concede that, if the judgment against Gafford and Marshall is affirmed, this appeal is moot. *Tice v. Ebeling*, 238 Kan. 704, 707, 715 P.2d 397 (1986). We agree. In view of our affirmance of the trial court judgment, we need not address plaintiffs' "conditional" appeal.

#### B. Abbott's Cross-Appeal—Admission of Evidence

On cross-appeal, Abbott argues that the trial court erred in admitting into evidence the 1987 version of the package insert enclosed with the drug tetracaine. In 1987, Abbott changed its package insert to include the information plaintiffs contend should have been included in the 1981 package insert. The package insert was admitted in evidence, over Abbott's objections, during the plaintiffs' case in chief. The evidence was admitted only as to Marshall and Gafford and the court indicated the jury would be instructed not to consider the evidence in the case against Abbott.

At the close of plaintiffs' case in chief, the trial court sustained Abbott's motion for a directed verdict. Since a directed verdict was entered in favor of Abbott, and as we have determined that the judgment of the trial court must be affirmed, we conclude Abbott has no standing to pursue the cross-appeal. *Gigot v. Cities Service Oil Co.*, 241 Kan. 304, 737 P.2d 18 (1987); *Blank v. Chawla*, 234 Kan. 975, 678 P.2d 162 (1984); *In re Waterman*, 212 Kan. 826, Syl. ¶ 7, 512 P.2d 466 (1973). We therefore decline to consider the issue further.

## IV. CONCLUSION

This case was tried before one of the most experienced trial judges in Kansas. The parties were represented by some of the most respected medical malpractice counsel in the state. The trial of the case spanned a period of almost seven weeks. Numerous experts of unquestioned integrity and competence from some of the most prestigious medical facilities in the country were called to testify. The record before this court is contained in seven file boxes and includes nearly 6,000 pages of trial transcript, seven volumes of district court pleadings, numerous medical treatises and articles, trial exhibits, medical records, pretrial transcripts, and numerous depositions. We received comprehensive briefs by counsel for the parties and *amici* briefs from the Kansas Association of Defense Counsel, the Kansas Medical Society, and the Kansas Hospital Association. A careful review of the record and briefs on appeal discloses that, although this may not have been a perfect trial, all parties received a fair trial. They cannot ask for more. *Schneider v. Washington National Ins. Co.*, 204 Kan. 809, 815, 465 P.2d 932 (1970). We conclude that any error which occurred was harmless error. K.S.A. 60-261 and 60-2105.

The judgment is affirmed.

HERD, J., concurring and dissenting: I concur with the majority opinion except for the part which holds K.S.A. 1988 Supp. 60-1903 constitutional. I would hold it unconstitutional under the equal protection guarantees of Sections 1 and 18 of the Kansas Bill of Rights. I find no rational basis for applying limitations on nonpecuniary damages for bereaved spouses and children in a wrongful death action while others are treated differently.